HELLENIC AMERICAN NEIGH-
BORHOOD ACTION COM-
MITTEE, Plaintiff,

v.

The CITY OF NEW YORK, Mayor Ru-
dolph Giuliani, City of New York Hu-
man Resources Administration, Marva
Livingston Hammons, Deputy Commis-
sioner Seth Diamond, Deputy Commis-
sioner Violet Mitchell and City of New
York Department of Youth Services, De-
fendants.

No. 96 Civ. 3185.

United States District Court,
S.D. New York.

June 27, 1996.

As Amended July 2, 1996.

As Clarified July 31, 1996.

Kaye, Scholer, Fierman, Hays & Handler, LLP., Allan M. Pepper, Adam D. Cole, Yoon Hi Greene, New York City, for Plaintiff.

Corporation Counsel of City of New York, Paul A. Crotty by Lawrence S. Kahn, Jonathan S. Becker, Michael S. Adler, Barbara R. Keller, New York City, for Defendants.

## OPINION AND ORDER

SOTOMAYOR, District Judge.

This is an action brought pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitution seeking preliminary and permanent injunctive relief against the defendants (collectively, the "City"). Before me is a motion for a preliminary injunction by plaintiff Hellenic American Neighborhood Action Committee ("HANAC"). For the reasons set forth, the motion is **GRANTED.**[1]

## BACKGROUND

### I. Introduction.

In this case plaintiff claims that without due process, it has been stigmatized and subjected to a *de facto* debarment as a bidder for City contracts based on unsubstantiated charges of corruption. The City claims that the pendency of an investigation by the Office of the U.S. Attorney, combined with preliminary findings by the City's Department of Investigation ("DOI"), as well as clearly improper and possibly criminal conduct by HANAC's president (since dismissed by HANAC's board of directors), warrant the City's refusal to renew existing contracts or enter into new ones with HANAC until completion of the investigation.

This action poses a clash between plaintiff's right to its good name and continuing status as an eligible bidder, and the limits imposed by the City's regulations upon its right to act quickly and decisively when it suspects the public fisc is being subverted by corrupt practices.

### II. Legal Background.

Before examining the specifics of this case, an understanding of the due process protections afforded by the City Charter and the rules promulgated thereunder to persons selling goods and services to the City is useful.

A bidder for City contracts such as the ones at issue here must clear two hurdles. First, the bidder must achieve the highest score in a complex balancing of factors relevant to contract performance, including price. Charter § 319. Second, and more relevant for this case, a bidder must be found to be "responsible" by the agency granting the contract. The two most powerful weapons the City has at its disposal to combat corruption among its vendors are a finding that a vendor is "non-responsible" and/or the suspension or debarment of a vendor. A third mechanism allows the City Comptroller to refuse to register a contract (effectively revoking it) "if in the Comptroller's judgement there is sufficient reason to believe that there is possible corruption in the letting of the contract or that the proposed contractor is involved in corrupt activity." Charter § 328(c).

Rules mandated by the City Charter set out the procedures for the use of these weapons so as to ensure fairness.

---

**1.** Plaintiff has also moved for expedited discovery. In light of the outcome of the preliminary injunction motion, I will hold all discovery in abeyance until the conclusion of the name clearing hearing, and any appeal thereof, ordered herein.

### A. *Non–Responsibility Determinations.*

The City Charter requires that contracts be awarded to the "lowest responsible bidder," Charter § 313(b)(2), and establishes a Procurement Policy Board ("PPB") with the power to, *inter alia* "promulgate rules ... establishing ... standards and procedures to be used in determining whether bidders are responsible." Charter § 311.[2] The PPB Rules define a responsible contractor as

> one which has the capability in all respects to perform fully the contract requirements and business integrity to justify the award of public tax dollars.

PPB Rules § 5–02(b)(1). The Rules do not specify an exhaustive list of factors to be considered, but merely list eight that may be included, one of which is "a satisfactory record of business integrity." PPB Rules § 5–02(b)(2)(vi). The bidder has the burden of proof to show it is "responsible." PPB Rule § 5–02(a)(2). Of significance for this action is the fact that the PPB Rules vest with the chief of each of the City's procuring agencies, and not the Mayor, the power of "final approval in the award of contracts of goods, services and construction." PPB Rules § 5–04(a).

The PPB Rules also require the City to maintain a publicly accessible computer database of all bidders (the "VENDEX") which must be checked for adverse entries by agency contracting officers. The Rules further require the DOI to search its database to determine whether a bidder has been "the subject of an investigation by the Department." If an investigation is underway, the agency may request a report from the DOI on its findings. PPB Rules § 5.02(f). The agency contracting officer and the agency head have the discretion to determine whether the DOI investigation warrants a non-responsibility finding; it is not automatic. *Id.*

The effect of a non-responsibility determination applies, as a formal matter, only to bids made by the non-responsible vendor to the agency making the determination. But because it must be reported on the VENDEX (PPB Rules § 5.02(g)(3)), such an action has a City-wide effect. The City's administrative code provides:

> No contract for goods or services involving the expenditure of more than ten thousand dollars ... shall be let by an agency, elected official or the council, unless the contract manager or other person responsible for making the recommendation for award has certified that [the VENDEX] and information maintained pursuant to Section 6–166.1 of this code have been examined.

Administrative Code § 6–116.2(e).[3]

The non-responsibility determination is appealable from the agency contracting officer to the agency head, and from there to the Mayor, who may delegate the authority to hear the matter to the City Chief Procurement Officer. PPB Rules § 7–03. The contract award is stayed during the pendency of the appeals. PPB Rules § 7–03(d).

### B. *Suspension and Debarment.*

The City Charter provides that "[no] person or firm shall be suspended or debarred from contracting with the City or an agency of the City ... [without] reasonable notice and a reasonable opportunity to be heard at a hearing to be held on the record." Charter § 335(b)(1).

The PPB Rules again provide a non-exhaustive list of the grounds for debarment, including "indictment or conviction" for an enumerated list of crimes associated with corrupt practices, "except that indictment alone may be a cause for debarment only for such time as the indictment continues." PPB Rules § 7–08(a)(1)(i). Other grounds include "an agency determination of non-responsibility," PPB Rules § 708(a)(1)(vi), or "[a]ny other cause sufficiently serious and compelling that a reasonable person would

---

**2.** The Charter was enacted in 1989 after approval by referendum of New York City's voters. The PPB is composed of five persons, three of whom are named by the Mayor. Charter § 311. The PPB Rules were first promulgated in 1990. The Charter also empowers the PPB to "promulgate additional rules, policies and procedures consistent with" the Charter. Charter § 311(c).

**3.** The VENDEX is also utilized by state and federal contacting authorities to conduct background checks.

seriously doubt the capability of the contractor to perform City contract requirements." PPB Rules § 708(a)(1)(xi).

The debarment process can be initiated at any time by an agency head who makes a recommendation for debarment in consultation with the Corporation Counsel, the City's legal representative. Sole authority for a debarment determination is invested with the City's Office of Administrative Trails and Hearings ("OATH"). Charter § 335(b)(i). OATH hearings must be "consistent with principles of fundamental fairness and due process." PPB Rules § 7–08(d)(1). There is no appeal to the Mayor (or any other body, except the courts) from a debarment determination by OATH. A debarment disqualifies a bidder from being awarded city contracts or exercising a renewal option for up to five years, at the discretion of OATH. Charter § 335(b)(i); PPB Rules § 7–08(i).

A suspension for up to three months may be instituted by an agency contracting officer, subject to an appeal to the agency head, "if there is probable cause for debarment." Charter § 335(b)(2). The agency contracting officer must either have "knowledge of facts which may form the basis" for a debarment petition, or actually have filed a debarment petition. PPB Rules § 7–08(c)(1). Upon notice of a suspension, the vendor has five days to challenge it in writing. The agency head must then make a final determination in writing which is not subject to further administrative appeal. PPB Rules § 7–08(e).

## C. *Comptroller's Veto.*

Additional power to investigate and block contracts believed to be secured by corrupt means is delegated by the Charter to the Comptroller. Charter § 328; PPB Rules § 5–07(h). The Comptroller's decision not to register a contract is appealable to the Mayor. PPB Rules § 507(h)(2)(i)(4).

## D. *Judicial Review.*

Once administrative appeals have been exhausted, a bidder may appeal an adverse finding to the state court either as a mandamus proceeding under New York Civ.Prac. Law Rules Art. 78, or as an action at law.

## III. Factual Background.

### A. *The Parties.*

Plaintiff in this action is a New York state not-for-profit community service organization. For 25 years it has received government contracts to provide various services to New York residents.

Defendant Marva Livingston Hammons is the Administrator/Coordinator of the City's Human Resources Administration ("HRA"), which had six ongoing contracts with HANAC (the "HRA Contracts"), and two new ones (the "WAY Contracts"). Defendant Seth Diamond and Violet Mitchell are HRA Deputy Commissioners involved in the letting and supervision of HANAC contracts. Defendant Department of Youth Services ("DYS") had one contract with HANAC that it has terminated "in the best interests of the City" and two which HANAC was recently granted (the "Beacon Schools Contracts"), that have also been terminated due to a finding of non-responsibility by DYS. Since this action commenced, the Department for the Aging, which had been considering HANAC for contracts where HANAC was the apparent successful bidder, notified HANAC that it has made a non-responsibility finding against HANAC. Letter of Lawrence S. Kahn dated June 20, 1996. The City has made emphatically clear in the course of this litigation that it does not intend to renew any of its contracts with HANAC or permit HANAC to bid on new ones until closure of the U.S. Attorney's investigation.

Approximately 70% of HANAC's funding is derived from contracts with the City. The remainder comes from state and federal contracts and private sources. Ten City contracts will expire on June 30, 1996, comprising approximately 35% of HANAC's revenue, and two contracts will expire on September 30, 1996, comprising about 15% of its revenue. Second Supp.Aff. of John Kaiteris in Support of Mot. for Prelim. Inj. ¶ 4, 6, 7.

### B. *Chronology of Events.*

HANAC's unblemished record as a city contractor came to an end with the publication on March 26, 1996 of an article on the front page of the New York Times headlined

"Giuliani Officials Broke Rules on Contract Bids with Agency." Ex. G to Pltf.'s Order to Show Cause. The article details purported irregularities in HRA's grant of the WAY Contracts. The article closely parallels the facts described in a letter dated March 19, 1996 from the Comptroller to the HRA (the "Comptroller's Letter"). Ex. N to Pltf.'s Order to Show Cause. The Comptroller's Letter details the results of a months-long investigation into the letting of the WAY Contracts, valued at $43 million, and requested an explanation (i) for their granting even though another bidder had been more highly rated, and (ii) for a $19.1 million discrepancy between what HANAC first said the contracts would cost and the contract price which was finally agreed upon.[4]

On March 27, 1996, the Comptroller issued a letter concluding "the process failures described in the March 19, 1996 letter to you violate the public trust and tenants of basic fairness and common sense." Ex. O to Pltf.'s Order to Show Cause. The same day, defendant Mayor Rudolph Giuliani directed the DOI to review all HANAC contracts. Aff. of Seth Diamond at ¶ 14. The U.S. Attorney's Office also commenced an investigation. Decl. of Peter M. Bloch ¶ 4. The Mayor then ordered HRA to terminate the HRA and WAY Contracts. Defs.' Mem. of Law in Op. at 6. Defendant Seth Diamond did so, citing a clause in the contracts allowing their unilateral termination on 30 days notice if the City believed it to be in its "best interests." Aff. of Seth Diamond ¶ 15.

By letter dated April 3, DYS notified HANAC that it had been declared a "non-responsible proposer ... based on the fact that there is a ongoing investigation of HANAC, Inc. and its affiliates by the New York City Department of Investigation and the Office of the United States Attorney." Ex. Q to Pltf.'s Order to Show Cause. This action had the effect of terminating the Beacon Schools Contracts. The HRA agency contracting officer, Lin Saberski, purportedly made the non-responsibility finding "based on the fact that there was an ongoing investigation of

HANAC by the New York City Department of Investigation and the Office of the United States Attorney." Aff. of Lin B. Saberski at ¶ 4. The same day, DYS caused an entry to be made in the VENDEX stating that HANAC had been "FOUND NON–RESPONSIBLE DUE TO PENDING DOI AND U.S. ATTORNEY INVESTIGATIONS." Ex. C to Decl. of Barbara R. Keller at 5.

By letter dated April 4, Richard M. Bonamarte, Director of the Mayor's Office of Contracts, and the City's Chief Procurement Officer ("Bonamarte"), instructed the heads of all City agencies that "pending further notice, *no procurement action of any kind* is to be taken involving [HANAC and its affiliates], without first consulting with this Office." Ex. A to Reply Aff. of Richard M. Bonamarte (emphasis in original). It is this action that plaintiff maintains was a *de facto* debarment violative of its due process rights. HANAC became aware of the letter's existence only as a result of this litigation. HANAC claims it did not have notice of the *de facto* debarment until, in the course of this litigation, the City unequivocally indicated that it would not renew contracts nor consider new contract applications from HANAC until the U.S. Attorney concluded its investigation. Rely Mem. of Law in Further Support of Pltf.s' Mot. for Prelim. Inj. at 14.

In the course of this litigation, Bonamarte has explained the City's current policy toward HANAC as follows:

> [T]he City has not terminated existing contracts being satisfactorily performed by HANAC unless it has a contract-specific basis for believing that it is in the City's best interest to terminate a contract. In light of the pending investigation of HANAC, however, the City has not taken further procurement action involving HANAC or its affiliates, i.e. awarded new contracts or extended existing contracts. This policy will, of course, be reevaluated, and further procurement may be allowed, as information regarding HANAC is received from those entities currently conducting investigations.

---

4. In the aggregate, the WAY Contracts, if they had been implemented, would have increased HANAC's revenues at least three-fold. *See,* Kait-

eris Aff.Ex. A., Aff. of Richard A. Bonamarte ¶ 3. It is not clear from the record whether the Comptroller ever registered them.

Aff. of Richard M. Bonamarte sworn to May 3, 1996 at ¶ 6. Bonamarte has stated the City's reason for the action as follows:

> Clearly, the City must have the ability to refrain from contracting with entities that are untrustworthy, dishonest or otherwise lacking in business integrity. Where a law enforcement agency is raising serious issues about a contractor, the City must be able to refrain from doing business with the entity while it is under investigation by the appropriate authorities.

Bonamarte Reply Aff. at ¶ 5. Bonamarte later refined the policy statement by asserting that his office would conduct a "case-by-case" evaluation balancing the programmatic needs of the respective agencies with the concerns raised by the U.S. Attorney's investigations. Reply Aff. of Richard M. Bonamarte sworn to May 14, 1996 at ¶ 9.

However, at a conference before the Court on May 17, the attorney for the City stated the only factor the City will consider in evaluating any HANAC contract application or renewal is the pendency of the U.S. Attorney's investigation. "It is the position of the City that unless further information is received from the U.S. Attorney's office that sheds a positive glow on HANAC that contracts will be denied." Tr. at 15. The City's action was undertaken "to coordinate activities and ensure that there are not inconsistent results." Tr. at 40. The City made clear that its policy was for an indefinite period. Tr. at 42.

Other than extending the termination date of a single contract set to expire on May 4 to June 30, Bonamarte has not struck the balance in HANAC's favor. The City has stated that those agencies before whom HANAC has pending bids will each make a "non-responsibility" finding, thus ejecting HANAC from consideration, even though it was the best bidder. Supp.Decl. of Barbara R. Keller sworn to May 16, 1996 at ¶ 2.

HANAC pursued administrative and judicial avenues to appeal the termination of the HRA Contracts. On April 26, HANAC initiated an action under Article 78 of the New York Civ.P.Law. & Rules in New York State Supreme Court challenging the City's termination of the six HRA Contracts "in the best interests of the City." HANAC argued that this action was subject to administrative review pursuant to PPB Rules § 7–04. This section provides for the resolution of disputes over "contract administration" by appeals to the Comptroller and then to a Contracts Dispute Resolution Board. HANAC did not assert any due process claims nor did it challenge DYS's non-responsibility finding or the City's alleged de facto debarment. On May 8, Justice Herman Cahn denied HANAC's request for relief, holding the HRA Contracts were "terminable at will" and that PPB § 7–04 applied to disputes over money, not termination. Ex. A to Decl. of Barbara R. Keller at 5, 7. HANAC's motion for an appeal pursuant to N.Y.Civ.P.Law & Rules § 5701 was denied by a justice of the Appellate Division on May 9.

HANAC simultaneously pursued administrative appeals within DYS afforded by PPB Rules § 7–03, challenging HANAC's designation as a "non-responsible" bidder. But on May 29 HANAC abandoned the process, believing it to be a "useless endeavor ... because the process supposedly being provided is not meaningful" in light of what it believed was the City's blanket decision to terminate HANAC's contracts as they come up for renewal and preclude HANAC from obtaining new ones until the U.S. Attorney's investigation exonerated HANAC. Ex. A to Decl. of Lawrence Kahn dated May 31.

By letter dated June 14, the agency contracting officer for the Department for the Aging informed HANAC that he had found HANAC non-responsible due to the pending U.S. Attorney investigation, and apprised HANAC of its rights to appeal the determination to the agency head, and subsequently to the Mayor. This action had the effect of eliminating HANAC as a bidder for three contracts for which it had been the low bidder.

The City asserts its present policy toward HANAC is predicated on four grounds: admissions of impropriety by HANAC with respect to the actions of its president George Sarant ("Sarant"), the Comptroller's Letter, ongoing investigations by the DOI and the U.S. Attorney, and newspaper reports of cor-

rupt practices by Sarant and at least one other HANAC employee. Some detail on each of these is useful in understanding the City's policy toward HANAC.

It is undisputed by the parties that in December, 1995 Sarant improperly caused the assignment of the HRA Contracts and the WAY Contracts from HANAC to a corporation he controlled. HANAC's board of directors claim they had no knowledge of Sarant's actions—the board chairman claimed he was "duped" into signing the assignment documents—and that once they discovered it, they reported it to HRA and terminated Sarant. Aff. of John Kaiteris in Support of Order to Show Cause at ¶ 22–32. The City concluded from this episode that "HANAC was in a state of disarray...." Defs.' Mem. of Law in Op. at 4. A May 24 New York Times article also asserted that Sarant had offered to hire the father and brother of an official in the Mayor's administration, and that another HANAC official had made a job offer to an HRA official involved in the letting of the WAY Contracts. Ex. O to Second Supp. Decl. of Barbara R. Keller.

The Comptroller's Letter exhaustively details irregularities in the actions of HRA officials in the letting of the WAY Contracts. By improperly scoring HANAC's bid, HRA officials caused it to be awarded the contract over that of a lower cost bidder who would otherwise have been the top rated bidder, had the PPB Rules been followed. There are no allegations of wrongdoing by HANAC contained in the Comptroller's Letter, however.

The Comptroller's Letter, in combination with the newspaper articles, triggered the DOI and U.S. Attorney investigations. Because the DOI is an instrumentality of and reports to the Mayor, it bowed out of the investigation on May 1, deferring to the U.S. Attorney. Decl. of Peter M. Bloch dated May 3, 1996. A hotly contested issue of fact is the scope of the DOI and U.S. Attorney investigations. HANAC claims any wrongdoing is ascribable to its rogue employee Sarant, possibly acting in concert with City officials in a corrupt scheme to defraud HRA. HANAC claims the Mayor is "scapegoating" HANAC for the actions of City officials, in-

cluding some on the Mayor's own staff. HANAC denies any wrongdoing and asserts that neither the month-long DOI investigation nor the on-going U.S. attorney inquiry furnish grounds for a non-responsibility finding against HANAC. Aff. of John Kaiteris sworn to May 1, 1996 at ¶ 36.

DOI Assistant Commissioner Peter M. Bloch, in a declaration dated May 30 and filed under seal (the "Bloch Affidavit"), described the results of the DOI investigation upon which was founded the City's belief that HANAC officials other than Sarant had been engaged in corrupt and criminal acts. HANAC has disputed the accuracy of this affidavit but has declined to give its own account, citing confidentiality concerns arising under Fed.R.Crim.P. 6(e). If the Bloch Affidavit were to be credited, it furnishes grounds to believe that HANAC officials other than Sarant in fact engaged in corrupt acts.

On May 31, the U.S. Attorney sent HANAC's attorneys a letter which reads in full as follows:

> This letter is to advise you that your client, the Hellenic American Neighborhood Action Committee, known also as "HANAC", is currently a "subject" of an ongoing federal criminal investigation, as that term is defined by the United States Attorneys Manual ("USAM"). Section 9–11.150 of the USAM defines a subject of an investigation as "a person whose conduct is within the scope of the grand jury's investigation."
>
> At the present time, HANAC is not a "target" of the on-going investigation, as that term is defined in the USAM. Section 9–11.150 defines a "target" of an investigation as "a person as to whom the prosecutor of the grand jury has substantial evidence linking him/her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant." Should the status of HANAC change with respect to this investigation, we will so notify you.

Ex. A to Decl. of Paul J. Curran.

This action was commenced on May 1. Plaintiff initially sought a temporary restraining order (i) requiring defendants to

reinstate the HRA Contracts, (ii) enjoining defendants from deeming HANAC a non-responsible bidder and requiring it to purge the VENDEX, and (iii) restoring HANAC to its previous status as a City vendor. Complt. at 15. HANAC has since abandoned the request for a TRO and for the reinstatement of the HRA Contracts. It now seeks a preliminary injunction (i) forbidding the City from permanently awarding any contracts for which it has been precluded from bidding upon to another bidder, which the City states will do commencing June 30, (ii) requiring that the VENDEX be "cleansed" and (iii) forbidding the City from refusing to consider HANAC's applications for new contracts and renewals on the basis of the *de facto* debarment of HANAC, "without first affording HANAC the due process to which it is entitled." Pltf.'s Second Supp.Mem. of Law at 27–28.

### DISCUSSION

This case poses multilayered issues of due process and federal-state comity. Six issues must be resolved: (1) whether plaintiff has a property or liberty interest cognizable by the Fourteenth Amendment and Section 1983 that has been adversely affected by the City's actions; (2) if so, whether the City's actions rise to the level of debarment; (3) whether the City has afforded HANAC adequate due process protections to secure its protected interests; (4) whether this Court should abstain from adjudicating the controversy pursuant to an abstention doctrine, or on the basis of the preclusive effect of the Article 78 proceeding; (5) if not, whether plaintiff's injury satisfies the prerequisites for a prohibitory or mandatory injunction, as the case may be; and (6) if so, what the scope of that relief should be. I examine these questions in turn.

### A. *Fourteenth Amendment Interests Implicating Due Process.*

For the reasons set forth below, I believe HANAC has a liberty interest in its reputation cognizable by the Fourteenth Amendment and Section 1983, and a cognizable property interest, but only in its *status* as an eligible bidder, and not in the award or renewal of any particular contract.

1. *Liberty Interest in Reputation.*

■ It is well-settled that a person's reputation for integrity is a constitutionally protected liberty interest when its loss is coupled with "an accompanying loss of government employment." *Paul v. Davis,* 424 U.S. 693, 706, 96 S.Ct. 1155, 1163, 47 L.Ed.2d 405 (1976). *See also Board of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972); *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971) (finding protectible interest where "a person's good name, reputation, honor, integrity is at stake because of what the government is doing to him"). In this Circuit, that test has been essentialized as "stigma plus," *Neu v. Corcoran,* 869 F.2d 662, 667 (2d Cir.), *cert. denied,* 493 U.S. 816, 110 S.Ct. 66, 107 L.Ed.2d 33 (1989), requiring that a state instrumentality not only defame the plaintiff, but "place a tangible burden on [plaintiff's] employment prospects" without the requisite due process protections. *Valmonte v. Bane,* 18 F.3d 992, 1001 (2d Cir.1994).

The City attempts to distinguish *Valmonte* on the grounds that any stigma attaching here is not of the magnitude or duration of the "child abuser" stigma at issue in *Valmonte* since an adverse VENDEX entry by one City agency does not automatically preclude a contractor from other contracts. The City also argues it has good reason to find HANAC non-responsible as compared to the infirm basis for the entry of a person's name on a state-maintained child abuser list challenged in *Valmonte.*

■ The effect of non-responsibility labels was recently examined by a commission composed of the City's senior procurement officials. They were empaneled to study the responsibility determination process and concluded in a 1993 report that the practical effect of a single non-responsibility finding on a bidder is draconian: "To be found non-responsible in New York City today, is to bear a stigma of 'corruption'." Procurement Policy Board, City of New York, *An Assessment of New York City's Vendor Responsibility Determination Process,* November 12,

1993 (the "PPB Report") at 18, attached as Ex. C to Second Supp.Aff. of John Kaiteris in Support of Mot. for Prelim. Inj. While performance capability and financial soundness are also "responsibility" factors, "[u]nless there are clearcut performance issues, agency findings of responsibility or non-responsibility will be primarily driven by the issue of integrity or 'moral worth' ... because agency contracting personnel are reluctant to stigmatize contractors on the basis of [other] factors." *Id.* Moreover, the PPB Report concluded,

> agencies appear to be using their own and each other's prior determinations of non-responsibility (which results in a "caution" in the VENDEX database) to justify their continuing exclusion of these vendors from the City's contracting process—in effect, a "de facto" debarment.

*Id.* at 21. Based on this report, the credibility of which the City does not challenge (and indeed quotes repeatedly, *e.g.* Defs.' Supp. Mem. of Law in Op. at 14), I conclude that a non-responsibility finding reported on the VENDEX has a powerful stigmatizing effect that substantially limits HANAC's opportunities to secure government employment, and thus a liberty interest protectible under the Fourteenth Amendment and § 1983 is implicated.

The City also argues that this case is governed by *S & D Maintenance Co., Inc. v. Goldin,* 844 F.2d 962 (2d Cir.1988) In *S & D Maintenance,* the court rejected a § 1983 "stigma plus" claim by a City contractor stemming from City officials' statements to the press that S & D Maintenance was under investigation for corrupt practices. Holding that the defendants "merely state[d] the undisputed fact that S & D is under investigation" and "whatever stigma attached is the result of the investigation itself, a matter of

public record," *S & D Maintenance* at 971, it held no liberty interest was implicated.

The facts of *S & D Maintenance* are distinct from those at bar. Here the City, by making a non-responsibility finding, has affirmatively determined that the existence of the U.S. Attorney's investigation furnishes grounds for an opprobrious label. The words "found non-responsible" carry the implication that an agency head has independently found good cause to adopt the DOI's suspicions. The PPB Report makes clear that such a finding carries a far greater impact than mere quotations of city officials in the press.[5]

### 2. *Property Interest.*

◾ HANAC argues that it has a property interest in "participating in the procurement process." Supp.Mem. of Law in Support of Pltf.s' Mot. for Prelim. Inj. at 24–28. It cannot claim any entitlement to renewal of its expiring contracts, as that is, absent a state statute barring non-renewal without cause, a matter of contract and not constitutional law. *S & D Maintenance* at 967. But the teachings of the Supreme Court and this Circuit recognize a Due Process property protection for a plaintiff's *status* as an entity eligible to bid on government contracts, where state law fetters discretion to debar or suspend bidders.

◾ *Roth* delineated the outer boundaries of a constitutionally protected property interest as those interests "defined by existing rules or understandings that stem from an independent source such as state law." *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709.

Where the state provisions bestow a right that cannot properly be eliminated except for cause, that right constitutes

---

5. The courts of New York state are in agreement. When a low bidder such as [HANAC] has its bid rejected with the inevitable implication of non-responsibility, its commercial "good name, reputation, honor or integrity is at stake."

*LaCorte Elec. v. County of Rensselaer,* 80 N.Y.2d 232, 238, 590 N.Y.S.2d 26, 604 N.E.2d 88 (1992) (citing *Board of Regents v. Roth, supra,* at 573, 92 S.Ct. at 2707, and quoting *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27

L.Ed.2d 515 (1971); *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 1160–61, 47 L.Ed.2d 405 (1976), and *Old Dominion Dairy Prods. v. Secretary of Defense,* 631 F.2d 953, 963 (D.C.Cir. 1980)); *Schiavone Constr. Co., Inc. v. Larocca,* 117 A.D.2d 440, 443, 503 N.Y.S.2d 196 (3rd Dept.1986) ("It is reasonable to assume that the refusal to award petitioners two contracts of such magnitude for the reason that they were not 'responsible bidders' had a drastic effect upon their ability to carry on their business.")

property protected by procedural due process.

*Plaza Health Laboratories, Inc. v. Perales,* 878 F.2d 577, 581 (2d Cir.1989). *See also Walz v. Town of Smithtown,* 46 F.3d 162, 168 (2d Cir.) (property interest in excavation permit where "the discretion of the Superintendent of Highways to deny an excavation permit is so circumscribed that the Walzes possessed an entitlement to a permit"), *cert. denied,* — U.S. ——, 115 S.Ct. 2557, 132 L.Ed.2d 810 (1995); *RR Village Ass'n, Inc. v. Denver Sewer Corp.,* 826 F.2d 1197, 1201 (2d Cir.1987) ("A state-erected entitlement that cannot properly be eliminated except for cause is a property right of which the holders may not be deprived without procedural due process."); *Myers & Myers, Inc. v. United States Postal Service,* 527 F.2d 1252, 1258–1259 (2d Cir.1975) (*de facto* debarment of government contractor, as opposed to mere non-renewals, invokes protected interest).[6]

The City Charter affords a right to bid on contracts that cannot be terminated except by suspension and debarment, i.e., for cause. Charter § 335(b)(1) (debarment "for cause"); Charter § 335(b)(2) (suspension "if there is probable cause for debarment").

I therefore conclude that if HANAC can show its status as a bidder has been adversely affected in a manner rising to *de facto* suspension or debarment, without the City having afforded minimal due process protections, HANAC has met its Fourteenth Amendment property interest requirement. The City's arguments are not to the contrary. Rather, it argues that no suspension or debarment has taken place. Defs.' Supp. Mem. of Law in Op. to Mot. for Prelim. Inj. and Expedited Discovery at 13; Defs.' Second Supp.Mem. of Law at 15.[7]

**6.** *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243 (2d Cir.1985), cited by the City, is not on point. The plaintiff there did not contest the truth of the cause for its debarment—that it had defaulted on City loans. *Id.,* at 247.

**7.** The City also argues that since all its HANAC contract *could* be terminated pursuant to their "best interests of the City" provisions,.and pending applications *could* be dismissed pursuant to language in the Request for Proposals that allow unilateral dismissal by the City, all without a

*B. Nature of the City's Actions.*

■ This is not a case where agency heads have utilized a non-responsibility determination of another agency in order to effect a *de facto* debarment. Here, the City has not allowed any of the due process procedures set forth in the PPB Rules to come into play because the Bonamarte letter of April 4 precluded any genuine case-by-case determination by agency heads on the issue of HANAC's responsibility, and instead substituted the judgment of the Mayor's Office of Contracts, headed by Bonamarte. Therefore, I do not reach the issue of whether HANAC would have been afforded sufficient due process had the procedures set out in the PPB Rules requiring agency determinations of non-responsibility been permitted to proceed in the normal course.

What is clear from the record before me is that the City effected a *de facto* debarment of HANAC. I do not credit the City's claim that there has been no alteration in HANAC's status, and that it is engaged merely in a contract-by-contract determination of HANAC's relationship with the City. The City has emphatically stated it will not renew the contracts expiring on June 30, nor any others, so long as HANAC "is under investigation by the U.S. Attorney's Office." Reply Aff. of Richard M. Bonamarte sworn to May 14 at ¶ 8. The "case-by-case" responsibility review on pending or newly submitted contract applications will be conducted by the Mayor's Office of Contracts under the same standard. *Id.* at ¶ 7. The City itself characterizes such a "case-by-case review" as follows:

The only issue as to which conceivably a factual hearing might be appropriate thus is whether the City's premise that plaintiff

non-responsibility, suspension or debarment proceeding, plaintiff has no protectible property interest. Second Supp.Decl. of Barbara R. Keller sworn to May 29, 1996 at ¶ 2. Had the City exercised these contract provisions in order to evade all procedural due process protections, an issue as to whether such an action contravenes notions of fundamental fairness might be ripe for review. Because the City has not taken these unilateral actions, I do not reach the issue.

is indeed under investigation is a correct one.

Defs.' Second Supp.Mem. of Law. 24. What is described by the City as a "case-by-case review" will actually be an inquiry limited to determining whether the U.S. Attorney's investigation is still pending, and if it is, the outcome is predetermined to be adverse to HANAC. Although nominally to be conducted by agency heads, the outcome has been dictated by the Mayor's office.

The PPB Report is highly instructive on the distinction between responsibility reviews and suspensions or debarments. The latter are "decisions made separate and apart from specific awards; they establish a vendor 'status' of eligibility or ineligibility for some future contract award(s)." "The responsibility determination, in contrast, is a contract-specific assessment about the contractor's ability to perform that contract going forward, made at the time of the contract award decision." PPB Report at 3. A court is empowered to look behind a defendants' characterization of its actions, and to their substance. *Myers & Myers,* 527 F.2d at 1259 (finding *de facto* debarment); *Art–Metal USA, Inc. v. Solomon,* 473 F.Supp. 1, 5 (D.C.Cir.1978) (same). By foreordaining the outcome of any non-responsibility appeal, the City has effectively debarred HANAC, but has done so without adhering to the procedures set forth in the PPB Rules.

Given the temporal proximity of the DYS's non-responsibility determination (and the resulting VENDEX entry) to the Mayor's order that DOI investigate HANAC and to Bonamarte's April 4 directive, I find that the DYS contracting officer did not make a *bona fide* independent determination as to HANAC's responsibility. Rather, the discretion committed by the PPB Rules to the agency contracting officer was preempted by the Mayor's office.

### C. *Due Process Requirements.*

Two separate due process questions are presented by the foregoing conclusions: (1) whether the City had constitutionally adequate reasons for its actions; and (2) given its debarment of HANAC, whether the City has afforded HANAC minimally adequate due process to contest that action. I address these questions in turn.

### 1. *Investigation as Grounds for Debarment.*

New York's highest court has recently held that " 'a bidder's honesty, integrity, good faith and fair dealing are valid considerations regarding whether a lowest bidder is a responsible bidder, and a criminal investigation ... can provide a rational basis for finding that such a bidder is non-responsible.' " *In the Matter of Joint Venture DeFoe Corp./American Bridge Co. v. New York City Dept. of Transp.,* 87 N.Y.2d 754, 642 N.Y.S.2d 588, 665 N.E.2d 158 (1996) (quoting *Matter of LaCorte Electrical Constr. and Maintenance, Inc.,* 195 A.D.2d 923, 600 N.Y.S.2d 818). *See also N.J.D. Electronics, Inc. v. New York City Health & Hospitals Corp.,* 205 A.D.2d 323, 324, 612 N.Y.S.2d 577 (1st Dept.1994). However, these and other similar New York cases cited by the parties address agency specific non-responsibility findings, and do not address the question of whether the mere existence of an investigation can support a debarment. The cases are instructive for determining minimal levels of due process, however. The *DeFoe* court upheld the Comptroller's refusal to register a contract on the basis of well articulated investigatory findings, which the plaintiff had an opportunity to rebut in its appeal to the Mayor. Similarly, in *N.J.D. Electronics,* a City agency's non-responsibility finding, based upon its own investigation and that of another agency, the results of which plaintiff had an opportunity to rebut, was upheld. *But see Konski Engineers, P.C. v. Levitt,* 69 A.D.2d 940, 942, 415 N.Y.S.2d 509 (3rd Dept. 1979), *aff'd,* 49 N.Y.2d 850, 427 N.Y.S.2d 796, 404 N.E.2d 1337, *cert. denied* 449 U.S. 840, 101 S.Ct. 118, 66 L.Ed.2d 47 (1980) (grand jury investigation alone justified state Comptroller's refusal to register). The facts of this case require me to decide the issue of whether the pendency of an investigation, and nothing more, is sufficient grounds for debarment.

The parties have cited no federal case in which a court addressed the constitutionality of a debarment (or its equivalent) based upon a pending criminal investigation. However,

in *Transco Sec., Inc. v. Freeman,* 639 F.2d 318 (6th Cir.), *cert. denied,* 454 U.S. 820, 102 S.Ct. 101, 70 L.Ed.2d 90 (1981), the court approved federal regulations permitting suspension of a contractor due to a pending criminal investigation, provided adequate procedural protections were afforded. Those protections consisted of adequate notice and a post-debarment opportunity to rebut the charges giving rise to the investigation. The *Transco* court emphasized that the debarment decision must be based on a review of the evidence underlying the investigation, and not the mere fact of the investigation. Notice to the contractor detailing the evidence was held crucial to providing the contractor with a meaningful opportunity to rebut. *Transco,* 639 F.2d at 324. The court held this could be done without jeopardizing the investigation. *Id.* at 324.

I find the *Transco* court's reasoning persuasive and hold that the rudiments of due process in this case require the City's agents, to independently review the evidence giving rise to the DOI and U.S. Attorney investigations, and make a judgment that it is sufficiently probative to call into question HANAC's integrity in order to debar it.

An agency head may well have had a constitutionally adequate reason for a non-responsibility determination as to HANAC, as evidenced here by the facts set forth in the Comptroller's Letter and by HANAC's own admission as to Sarant's culpable conduct, but the City was not entitled to debar HANAC and abdicate its responsibility to independently assess the evidence against HANAC. The fact of an investigation is the starting point for a debarment determination, not the end point. But even if I were to accept the City's contention that it arrived at its policy toward HANAC via a constitutional procedure, that does not end the inquiry.[8]

### 2. Adequacy of Post–Deprivation Due Process.

■ If there is a polar star in the Due Process universe, it is that the rights to liberty and property secured by the Fourteenth Amendment may not be abridged absent notice and an opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). At issue here is both whether HANAC was entitled to a hearing *prior* to the City's having taken any action adverse to it, and if not, whether the opportunity for a hearing after the fact that the City furnished to HANAC was adequate.

■ HANAC argues that it was entitled to a pre-deprivation hearing, i.e. that the City was required to give it a hearing before the DYS non-responsibility determination or the *de facto* debarment was effected. I disagree. The City would have had ample grounds, in this case, for either a non-responsibility finding or a suspension, without first affording HANAC a hearing. The Comptroller's Letter (and the DOI investigation based on it) and HANAC's admission that its president had engaged in serious wrong-doing was a sufficient basis for the invocation of the "exigent circumstances" exception to the requirement for a pre-deprivation hearing. *Federal Deposit Ins. Corp. v. Mallen,* 486 U.S. 230, 247–48, 108 S.Ct. 1780, 1791–92, 100 L.Ed.2d 265 (1988) (post-deprivation hearing adequate to protect suspended bank president's property right); *Accord Barry v. Barchi* 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979) (suspension without prior hearing held not to violate due process where there was adequate post-suspension hearing available); *Plaza Health Laboratories, Inc. v. Perales,* 878 F.2d 577, 583 (2d Cir.1989)

---

8. Other due process cases have denied plaintiffs the relief sought when it was apparent to the court that plaintiff could not meet the threshold requirement for a colorable claim contesting the stigmatizing allegation. *Cf. O'Neill v. City of Auburn,* 23 F.3d 685, 693–94 (2d Cir.1994) (plaintiff "must contest the truth of the allegedly stigmatizing statements" with some evidence); *S & D Maintenance,* 844 F.2d at 970 (plaintiff unable to claim falsity of allegedly stigmatizing statements fatal to action). Such is not the case

here. HANAC vigorously contests any knowledge of Sarant's improper acts, and denies wrongdoing by its current officers or employees. An impartial administrative hearing officer would assess the credibility of that claim and determine whether to sustain or vacate a debarment petition accordingly. This Court is required only to determine that HANAC has met the threshold requirement for credible claims controverting the basis for the City's action, which HANAC has done.

(post-deprivation hearing adequate process for Medicaid contractor suspended because of another state's indictment).

HANAC's argument that its status as a "subject" rather than a "target" of the U.S. Attorney investigation somehow immunizes it from either a non-responsibility finding or a debarment is misplaced. The labels change according to the progress of an investigation, and are therefore of scant significance. What is important is the adequacy of the evidentiary basis upon which government officials propose to stigmatize and debar one of its contractors and whether the contractor is given a meaningful opportunity to clear its name and restore its status as a bidder.

The City argues that it afforded HANAC an adequate post-deprivation hearing in the form of an appeal of the DYS non-responsibility determination. I do not agree. Even when viewed in the light most favorable to the City, the facts cannot support a conclusion that HANAC had a reasonable expectation of receiving, in the wake of the Bonamarte letter to all agency heads, a "meaningful" post-deprivation hearing by which it could challenge either the DYS non-responsibility finding or its *de facto* debarment. HANAC received notice of the non-responsibility finding on April 3, which also contained a notice of its right to appeal that determination to the DYS agency head and then to the Mayor or his delegate, per the PPB Rules. But the very next day, the Mayor's delegate, Mr. Bonamarte (to whom an adverse determination by the agency head was to be appealed), enacted a policy adjudicating the very issue that was to be appealed—HANAC's eligibility as a bidder. By his April 4 letter, Bonamarte ordered all new procurement by City agencies from HANAC halted on the grounds that the DOI investigation was pending. *"This Office* will then address any responsibility issues in conjunction with the Law Department and the Department of Investigation,"

the April 4 letter states. Ex. A to Bonamarte Aff. (emphasis supplied).

By issuing such a missive, the Mayor's chief contracting officer deprived the DYS agency head of any discretion in determining the merits of HANAC's challenge to the non-responsibility finding. It also arrogated to Bonamarte the power allocated to the other agencies to make their own responsibility determinations on a case-by-case basis at the contracting officer level and then, if appealed, by the agency head.[9] By so doing, Bonamarte denied HANAC perhaps the most central element of due process—an impartial decision maker.

The City argues that such an action was either (1) a trivial violation of City procedure not rising to a protectible level, or (2) within the Mayor's powers denominated by the Charter. I do not agree with either contention. As to the first, the opportunity to clear ones name in a hearing, the outcome of which has not been foreordained, is the essence of due process in a stigma-plus case. *Codd v. Velger,* 429 U.S. 624, 627, 97 S.Ct. 882, 883–84, 51 L.Ed.2d 92 (1977) (quoting *Roth* ). The cases cited by the City for the proposition that "[t]he mere fact that government administrators have violated their own procedural rules provides no basis for an assertion of deprivation of procedural due process," Defs.' Second Supp.Mem. of Law at 16, merely serve to pose the constitutional issue in sharper relief.

In *Schwartz v. Mayor's Committee on the Judiciary,* 816 F.2d 54 (2d Cir.1987) the court found that given the wide discretion committed to the defendant, technical violations of a regulation were inconsequential. In *McDarby v. Dinkins,* 907 F.2d 1334, 1337–38 (2d Cir.1990) the Court held:

> "When the minimal due process requirements of notice and hearing have been met, a claim that an agency's policies or regulations have not been adhered to does

---

9. The PPB Rules expressly contemplate the exercise of agency-level discretion on precisely the point at issue here—the level of evidence required to sustain a non-responsibility finding based on a pending investigation. PPB Rules § 5–02(f). Additionally, had the agency head overruled the non-responsibility determination and submitted the contract to the Comptroller for registration, the Bonamarte letter usurped the Comptroller's authority as well. Perhaps most importantly, it deprived HANAC of the right to make a record of the City's reasoning that could then be examined by a court.

not sustain an action for redress of procedural due process."

(quoting *Goodrich v. Newport News Sch. Bd.,* 743 F.2d 225 (4th Cir.1984) (citations omitted)).

In this case, what has occurred is the negation of any opportunity for a meaningful hearing, which is a non-discretionary entitlement, and thus cannot be analogize to the facts of either *Schwartz* or *McDarby.* The Charter and the PPB Rules prohibit the City from effecting debarments and suspensions (as well as non-responsibility findings) without due process. The City's disregard of these minimal procedural protections is, while not dispositive, certainly probative of a constitutional due process violation.[10]

As to the second contention, the Second Circuit has held:

[D]isqualification from bidding or contracting ... directs the power and prestige of government at a particular person and ... may have a serious economic impact on that person.... The governmental power must be exercised in accordance with basic legal norms. Considerations of basic fairness require administrative regulations establishing standards for debarment and procedures which will include notice of specific charges, opportunity to present evidence and to cross-examine adverse witnesses, all culminating in administrative findings and conclusions based upon the record so made.

*Myers & Myers,* 527 F.2d at 1259 (quoting *Gonzalez v. Freeman,* 334 F.2d 570, 574 (D.C.Cir.1964)).

The Charter prescribes a system of checks and balances in which procurement decisions are not allocated solely to the Mayor's discretion. Rather, power is apportioned between the agency heads, who are Mayoral appointees, the Comptroller and the Mayor. *See, e.g.* Charter §§ 311, 328, 335 (describing procurement and debarment powers). An independent body, the PPB, is established to enact rules to effectuate that power-sharing arrangement. Charter § 311. The City asserts in response that pursuant to the Charter "[t]he Mayor is the City's chief executive officer." Defs.' Second Supp.Mem. of Law at 7. It relies on the general language in the Charter regarding the Mayor's role as chief executive of the City.

> The Mayor shall be responsible for the effectiveness and integrity of city government operations and shall establish and maintain such policies and procedures as are necessary and appropriate to accomplish this responsibility including implementation of effective systems of internal control by each agency and unit under the jurisdiction of the mayor.

Charter § 8(a). But this language, insofar as it applies to this case, does nothing more than describe the PPB Rules, which are the written distillation of the "procedures and policies" the Mayor has promulgated. Moreover, if the Mayor finds them wanting, they may be amended by action of the PPB, a majority of whose members serve at his pleasure.

The City's concerns that it "have the ability to refrain from contracting with entities that are untrustworthy," Bonamarte Aff. at ¶ 6, are well founded. But the PPB procedures for suspension and debarment embrace this concern and harmonize it with elemental due process protections.

I conclude, therefore, that under *Mathews, Valmonte* and *Myers,* as well as its own Charter and rules, the City was required, as a constitutional minimum, to afford HANAC a genuine opportunity for a post-deprivation name clearing hearing, but did not.

#### D. *Res Judicata and Abstention.*

 I now turn to the issue of the preclusive effect of the Article 78 action, commenced by plaintiff five days prior to this one. Defendants argue that HANAC could have raised all the issues before this Court in its state court action, because "plaintiff was fully aware of adverse City action affecting multiple other contracts" in addition to the

---

**10.** "It is not every disregard of its regulations by a [state] agency that gives rise to a cause of action for violation of constitutional rights. Rather, it is only when the agency's disregard of its rules results in a procedure which in itself impinges upon due process rights that a federal court should intervene." *Bates v. Sponberg,* 547 F.2d 325, 329–30 (6th Cir.1976).

six HRA Contracts that were challenged under Article 78. Defendants cite *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994) which restates the "transactional approach to res judicata, barring a later claim arising out of the same factual grouping as an earlier litigated claim even if the later claim is based on different legal theories or seeks dissimilar or additional relief [citation omitted]."

Plaintiff replies that it has met the test set forth in *LaTrieste Restaurant and Cabaret Inc. v. Village of Port Chester,* 40 F.3d 587, 591 (2d Cir.1994), where a federal action was held not precluded by an earlier Article 78 when the § 1983 action "rests on different facts; is directed against different defendants, proceeds under a different theory of law and seeks different relief."

The recently decided case of *Brooks v. Giuliani*, 84 F.3d 1454 (2d Cir.1996), is instructive. There the court vacated a preliminary injunction where an earlier Article 78 and declaratory judgment proceeding addressed many of the same facts and claims for relief as were raised in the federal action. But the *Brooks* court held that at least one claim was not barred by res judicata because it was pled on the basis of "events and transactions that postdate[d] the state court proceedings." *Id.* at 1464–65.

Because the significance of key facts became apparent between the April 26 state court proceeding and the filing of this one on May 1, and because HANAC's due process claim stems in large measure from these facts, I hold that this proceeding is not barred by res judicata.

HANAC's understanding of its situation when it filed its state court proceeding was based on the HRA letter of March 28 asserting the HRA and WAY Contracts had been cancelled "in the best interests of the City," and the DYS letter of April 3 asserting it was found non-responsible because of the pending DOI and U.S. Attorney investigations. The City did not notified HANAC that it intended to decline to renew all expiring HANAC contracts and refuse to consider pending or new applications for so long as the U.S. Attorney investigation was pending. That policy only became clear during this litigation when the City turned over to HANAC the Bonamarte letter of April 4. Because the City up until that time couched its actions in the language of "case-by-case determinations" when in fact it was effecting a *de facto* debarment, any failure to apprehend the import of those actions cannot redound to the City's benefit.

Moreover, it was not until May 1 that the U.S. Attorney took over sole jurisdiction of the investigation of HANAC, and it was at that time that the City clarified its policy that no further contracts would be awarded to HANAC while the U.S. Attorney's investigation was under way. Bonamarte Reply Aff. ¶¶ 7, 8. This lends credence to HANAC's claim that it was only after the Article 78 proceeding was filed that the scope of the City's action—*de facto* debarment until favorable termination of the U.S. Attorney investigation—became apparent to HANAC. HANAC was effectively unable to plead the due process issues arising from the *de facto* debarment in the Article 78 complaint, and thus is not precluded from raising them now.

■■■ Nor do I credit the City's claims that a *Pullman* abstention is warranted here. Under *Railroad Comm'n of Texas v. Pullman*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), abstention is warranted "when difficult and unsettled questions of state law must be resolved before a substantial federal question can be decided." *Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 236, 104 S.Ct. 2321, 2327, 81 L.Ed.2d 186 (1984). In *Jayaraj v. Scappini*, 66 F.3d 36, 40 (2d Cir.1995), cited by defendants, the court held plaintiff's due process claim rested

upon an issue of state law, namely, whether seemingly conflicting provisions of the [New York] City Charter and municipal regulations give [HANAC] a property interest in employment entitling [it] to due process under the Fourteenth Amendment.

There is no such conflict here, as the Charter and the PPB Rules, as well as state and federal case law, are in harmony as to plaintiff's due process rights.

E. *Preliminary Injunction Standards.*

■■■ The standard for granting a preliminary injunction is the familiar two-prong

test described by the Second Circuit as a showing of (1) irreparable harm, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions on the merits and a balance of hardships in the movant's favor. *See Waldman Publishing Corp. v. Landoll, Inc.*, 43 F.3d 775, 779–80 (2d Cir.1994). When a government action taken in the public interest is involved, as it is in this case, the second half of the second prong, the so-called "fair grounds for litigation" standard, is unavailable. *See Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir.1996); *Plaza Health Laboratories, Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir.1989). This case, however, presents circumstances requiring HANAC to meet an even more demanding standard of proof to obtain the relief it seeks. As the Second Circuit explained in *Jolly*, where the injunction sought "will provide the movant with substantially all the relief sought, and that relief cannot be undone even if the defendant prevails at a trial on the merits," the moving party must show a "clear" or "substantial" likelihood of success on the merits. *Jolly*, 76 F.3d at 474 (quoting *Tom Doherty Assocs., Inc. v. Saban Entertainment Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995)).

■ I turn first to the irreparable harm prong. " 'When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable harm is necessary.' " *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir.1984), quoting 11 C. Wright & A. Miller, *Federal Practice & Procedure* § 2948, at 440 (1973). I have determined there is a constitutional liberty interest in one's good name at stake here, and I also find ample grounds for irreparable harm to HANAC's property interest. Although the City has terminated only a minority of HANAC's contracts, unless its name is cleared, a majority of them will shortly be terminated. "Major disruption of a business can be as harmful as termination, and a 'threat to the continue existence of a business can constitute irreparable injury' (citation omitted)." *Nemer Jeep–Eagle Inc. v. Jeep–Eagle Sales Corp.*, 992 F.2d 430, 435 (2d Cir.1993); *see also Roso–Lino Beverage Distribs., Inc. v. Coca–Cola Bottling Co. of New York, Inc.*, 749 F.2d 124, 125–26 (2d Cir. 1984).

The City has submitted numerous affidavits and declarations, as well as approximately 100 pages of briefing, in support of its actions. Yet the bare facts of this case are that irreparable damage has and will continue to be done to HANAC's reputation and revenue by the City's indefinite debarment of HANAC, while HANAC is precluded from a meaningful opportunity to challenge that action by the City's short-circuiting of the administrative appeals process. Within a few months, HANAC stands to lose approximately 40% of its revenue, and would lose 70% if the City's policy were to remain in force as all of HANAC's City contracts come up for renewal. It also stands to lose its state and federal contracts because these entities rely on the VENDEX as well. The City has in effect had the benefit of a three-month suspension of HANAC, the limit prescribed by the PPB Rules, without complying with the suspension procedures set forth by the PPB Rules. It must now either debar HANAC, and provide the attendant due process, or reinstate HANAC as a bidder in good standing.

HANAC has demonstrated a clear and substantial likelihood of success on the merits of its application for the relief sought by showing that it had a protected Fourteenth Amendment interest that was abridged by the City without due process. The balance of hardships tips decidedly in HANAC's favor, since the inconvenience of a hearing and any delay in the letting of contracts is outweighed by HANAC's loss of reputation and financial viability. There is nothing to prevent the City from extending the contracts that expire June 30, pending the outcome of the debarment hearing.

### F. *Scope of Relief.*

The City concedes: "Even if defendants' conduct did stigmatize plaintiff and infringe on its liberty interest, the remedy would be a name clearing hearing. *Baden v. Koch*, 799 F.2d 825, 832 (2d Cir.1986)." Defs.' Second Supp.Mem. of Law at 27. In addition to an opportunity to destigmatize itself, HANAC must also be permitted to show cause as to

why it deserves to be reinstated as an eligible bidder for City contracts.

On the basis of the foregoing findings, the appropriate relief is to preliminarily enjoin the City from disqualifying HANAC from bidding on contracts on the basis of a pending law enforcement agency investigation, until and unless it has conducted an expeditious name clearing hearing that finds adequate grounds for debarment. Although a federal court may not usurp the broad discretion states and municipalities have in fashioning the particulars of minimal due process, the City Charter, by establishing OATH, has provided a forum whose independence and procedures appear to more than pass constitutional muster.

In order to preserve the status quo, permanent award of any contracts for which HANAC was disqualified as a bidder must await the outcome of the name clearing hearing. The City is at liberty to decline to renew the contracts that will expire, however. But if the City has or elects to put them out for bid and HANAC elects to bid on them, the City must first have afforded HANAC the name clearing hearing before it disqualifies HANAC as a bidder. The City may, however, disqualify HANAC and award contracts to another bidder for bona fide reasons other than the pendency of an investigation, such as the performance related criteria set forth in the PPB Rules.

Because I conclude that the DYS and any subsequent agency non-responsibility determinations (and the VENDEX entries) were effected in a manner precluding the discretion and fact-finding that due process, as well as the PPB Rules, require, those determinations must be rescinded and the VENDEX entries purged pending the outcome of the name clearing hearing.

Accordingly, it is hereby

ORDERED, that any VENDEX entries of non-responsibility determinations regarding HANAC be purged pending the outcome of the name clearing hearing;

ORDERED, that any City contract denied HANAC, where it was the apparent successful bidder or for which HANAC has been denied an opportunity to bid or be considered based upon the pendency of an investigation, not be temporarily, permanently, or by emergency procurement let until the City grants to HANAC the right to appear at a bona fide administrative hearing at which it may have the opportunity to challenge, on the record, the City's debarment of HANAC.

**SO ORDERED.**