■ HOUSING WORKS, INC., et al., Respondents, v CITY OF NEW YORK et al., Appellants. [680 NYS2d 487] —Order, Supreme Court, New York County (Emily Goodman, J.), entered April 28, 1998, which, *inter alia*, granted plaintiffs' motion for a preliminary injunction enjoining the City defendants from terminating their contracts with plaintiff Housing Works and from otherwise interfering with Housing Work's contracts with the City, and directed an immediate trial on the merits, unanimously reversed, on the law, the facts and in the exercise of discretion, without costs, the motion denied, the injunction vacated, and

the matter remanded for further proceedings before a different Justice.

Plaintiff Housing Works, Inc. (Housing Works) is a nonprofit advocacy organization and provider of services for homeless persons with Human Immunodeficiency Virus and Acquired Immunodeficiency Syndrome (collectively, Persons With AIDS or PWA's). Since 1992, Housing Works has participated in the defendant City of New York's (City) Scattered Site Housing Program, administered by the City's Human Resources Administration (HRA). Under the program, participating vendors such as Housing Works enter into Scattered Site Contracts with HRA, which authorize vendors to lease apartments from private landlords and to provide support services for the PWA's.[1] The vendors are the tenants of record, and the PWA's are treated as licensees. The vendor pays the monthly rent, the utility charges and the cost of support services, and is subsequently reimbursed by the City. Pursuant to Housing Works's Scattered Site Contract, as amended in 1995, housing for approximately 200 PWA's and their families was obtained, at a cost in excess of $12 million per year. The Contract was terminable by HRA "without cause" or when it "was within the best interests of the City," and expired on June 30, 1997.

By early 1996, the City learned that Housing Works had been delinquent on some of its rent payments, and was otherwise experiencing financial difficulties. As a result, the City paid the rent arrears on many of the leases, and also obtained an independent audit of Housing Works's performance under the contract from 1992 through 1994. The audit revealed serious flaws in the accounting system utilized by Housing Works. This led to another audit by HRA's Inspector General in June 1996. The Inspector General's audit discovered a number of financial irregularities, including unexplained fund transfers between Housing Works and related entities, improper commingling of HRA funds, inadequate record keeping and misappropriation by a Housing Works employee. The report of the Inspector General recommended a comprehensive audit of Housing Works and that HRA consider an alternative, responsible vendor.

HRA hired another independent auditor, who completed the third audit of Housing Works between March and August 1997. This audit concluded that Housing Works had engaged in numerous financial improprieties including: fraudulent check endorsement; failure to keep separate books and records; fail-

---

1. The individual plaintiffs are PWA's seeking to represent a class of similarly situated persons living in apartments provided by Housing Works.

ure to cooperate with the auditor; and the unjustified expenditure of more than $500,000 in HRA-disbursed funds.

The City then took actions adverse to Housing Works which are the subject of this appeal. As announced in HRA's October 22, 1997 press release, the City's Chief Procurement Officer declined to authorize an amendment extending the Housing Works Scattered Site Contract beyond its June 30, 1997 expiration date. Additionally, other new Housing Works contracts for scattered site housing or services were recalled, or held in abeyance, pending the outcome of an investigation by the City Department of Investigation. The City also modified its Scattered Site Request for Proposals (RFP), which made it more difficult for Housing Works to successfully bid for new contracts.

Plaintiffs commenced the instant action on November 19, 1997, alleging that the City induced Housing Works to continue to provide housing and services after the expiration date of the Scattered Site Contract, misleading Housing Works into believing that the Contract would be extended and its expenditures reimbursed. The complaint asserted causes of action in fraud, promissory estoppel, breach of contract, tortuous interference with contractual relations and unjust enrichment. Plaintiffs further alleged that the City was acting in retaliation for Housing Works's exercise of its free speech rights, which Housing Works had vigorously exercised in the form of public demonstrations, criticism of City officials and lawsuits against the City and its agencies. On January 20, 1998, plaintiffs amended their complaint to allege a due process violation on the ground that the City's actions constituted a de facto debarment from City contract work without notice and an opportunity to be heard.[2]

This appeal arose over the IAS Court's grant of plaintiffs' motion for injunctive relief. The court granted a temporary restraining order (TRO) upon commencement of the action, enjoining the City from interfering with Housing Works's leases, requiring the City to deposit all rent arrears into Civil Court and requiring certain cash assistance payments to PWA's. As would become a pattern in this litigation, the City appealed the TRO,[3] invoking its statutory stay (CPLR 5519 [a]), and the plaintiffs moved in this Court to vacate the stay or dismiss the City's appeals of the original TRO, and the IAS

---

2. Plaintiffs also alleged that the de facto debarment violated the City's own guidelines, as set out in the New York City Charter (City Charter) and the Rules of the Procurement Policy Board (PPB Rules).

3. Prior to appealing, the City's motion to vacate the TRO was denied by a single Justice of this Court.

Court's January 12, 1998 oral extension of the TRO. On February 10, 1998, this Court granted plaintiffs' motion to dismiss the appeals, and *sua sponte* vacated the TRO.

One week later, the IAS Court reinstated the TRO on its original terms, pending a hearing on the motion for a preliminary injunction. Asserting that the reinstatement of the TRO was not in contravention of our order, the IAS Court ruled that the plaintiffs had satisfactorily demonstrated a likelihood of success on their tortious interference claim, and that irreparable injury may occur in the absence of the injunction. The City filed a notice of appeal, and plaintiffs again moved to vacate the City's statutory stay. This pattern of restraining orders,[4] followed by City appeals and motions to vacate the City's stays, continued until the IAS Court ultimately issued a preliminary injunction, constituting the order presently on appeal.

In support of their motion for a preliminary injunction, plaintiffs submitted documentary and other evidence obtained during discovery to demonstrate the likelihood of success on their retaliation claim. Such evidence included a notation by former Deputy Mayor Fran Reiter's chief of staff to the effect that "[Deputy Mayor] Fran [Reiter] hates [Housing Works]"; affidavits from two Housing Works directors stating that the then-HRA Commissioner advised them at a meeting in March 1997 that Housing Works could not expect fair treatment from the City so long as it continued to "cause trouble"; an affidavit from a Housing Works director stating that a City official made clear to him that no action would be taken on Housing Works's contracts pending the litigation since it was the City's policy not to do business with companies suing it; and the fact that the adverse actions taken by the City occurred one day after a public demonstration organized by Housing Works to protest the City's unfair treatment of it. Plaintiffs also challenged the accuracy of the third audit report, claiming that the City's reliance thereon was a pretext for retaliation.

In opposition, the City maintained that the results of the audits were the motivating factor behind its actions concerning the Housing Works Scattered Site Contracts. The HRA Commissioner denied making threatening comments toward Housing Works, and while not denying the comments made by for-

---

4. The TRO's progressively became broader, including directing the City to pay all accrued rent directly to the landlords instead of Housing Court; compelling the City to treat Housing Works as a responsible bidder; and requiring it to forward a specific contract to the Comptroller for registration and to process other contracts.

mer Deputy Mayor Reiter, the City asserts that the off-hand, hearsay comment does not evidence retaliation, but rather the understandable emotions of a City official subject to unrelenting criticism.

In the order appealed from, entered April 28, 1998, the IAS Court granted plaintiffs' motion for a preliminary injunction requiring the City to pay all rents due and owing from Housing Work's clients directly to the landlords.[5] The court found that plaintiffs had demonstrated that the PWA's faced "clear imminent and irreparable harm" from possible eviction for nonpayment of rent, that the equities clearly lay in plaintiffs' favor since the continuation of the Scattered Site Contracts does not prejudice the City and that plaintiffs had demonstrated a likelihood of success at least on their retaliation claim. The court further stated that even if an issue of fact existed as to the City's motivation, under amended CPLR 6312 (c), the presence of such factual dispute did not constitute grounds for denial of the motion.

A party seeking a preliminary injunction must clearly demonstrate (1) the likelihood of ultimate success on the merits; (2) the prospect of irreparable injury if the injunction is not issued; and (3) a balance of the equities in the movant's favor (*Doe v Axelrod,* 73 NY2d 748, 750). On appeal, the City argues that the IAS Court abused its discretion in issuing the injunction because the plaintiffs failed to demonstrate a likelihood of success on their retaliation and de facto debarment claims. We agree and therefore reverse the order appealed from.

In *Board of Commrs. v Umbehr* (518 US 668), the United States Supreme Court discussed the standard of proof required in a free speech retaliation claim brought by a government employee or contractor. To prevail on such a claim, the plaintiff "must prove that the conduct at issue was constitutionally protected, and that it was a substantial or motivating factor in the termination." (*Supra,* at 675.) If the plaintiff discharges that burden, the government will still not be liable if it shows by a preponderance of the evidence that it would have taken the same action even in the absence of the protected conduct, or by demonstrating that the free speech interests of the employee or contractor are outweighed by strong, countervailing governmental interests (*see, supra,* at 675; *see also, Mt. Healthy City Bd. Of Educ. v Doyle,* 429 US 274).

---

**5.** Although this was the only affirmative directive in the IAS Court's decision, the court "granted" the plaintiffs' motion for an injunction barring the City from "terminating" or "interfering" with Housing Works's contracts with the City. Thus, the injunction is not as narrowly tailored as plaintiffs suggest.

Viewed against this standard, we disagree with the IAS Court's assessment of plaintiffs' retaliation claim. Much of the evidence adduced by the plaintiffs, such as negative notations and alleged statements by City officials concerning Housing Works, is directly refuted by evidence submitted by the City. Although the existence of issues of fact is itself insufficient to deny a motion for an injunction (CPLR 6312 [c]), there is merit to the City's argument that the IAS Court, in granting the motion, resolved nearly all of these factual disputes in the plaintiffs' favor.[6]

Further, the City has offered highly persuasive proof that Housing Work's financial improprieties would have resulted in the same adverse action with respect to its City contracts. As indicated, three separate audits of Housing Works revealed flawed accounting and record keeping methods, and two found serious financial improprieties. Additionally, these findings were supported by a fourth audit conducted by the City's Department of Investigation (DOI). The DOI audit report, issued on March 17, 1998, stated that Housing Works's books and records were "woefully deficient," making it impossible to determine if any HRA money was diverted or misspent.

Moreover, the first two negative audit reports were issued in March 1996 and June 1996, well before the date that plaintiffs claim the City hatched its debarment conspiracy (March 1997), and the date the City announced its actions adverse to Housing Works (October 1997). Thus, the timing of these audits substantially undermines plaintiffs' claim that the City's actions were a pretext for retaliation against Housing Works's October 22, 1997 demonstration against the City. In short, the City has very strong evidence that it would have taken the same action against Housing Works even in the absence of the protected activities. Accordingly, it is far from clear that Housing Works will succeed on its retaliation claim.

Similarly, plaintiffs failed to demonstrate their entitlement to injunctive relief on their cause of action alleging a de facto debarment without due process. Unlike *Hellenic Am. Action Comm. v City of New York* (933 F Supp 286, 291 [SD NY 1996], *revd on other grounds* 101 F3d 877), where the City's Chief Procurement Officer specifically instructed the heads of all City agencies that " 'no procurement action of any kind is to be

---

**6.** While the plaintiffs claim that the City consented to waive an evidentiary hearing on the motion for an injunction, the City maintains that it objected to the lack of a hearing (CPLR 6312 [c]), and acquiesced only after the IAS Court assured the City's counsel that no credibility determinations would be made.

taken' " involving a specific government contractor until an investigation of that contractor by the United States Attorneys' Office was concluded, no such blanket preclusion is supported by the evidence here.[7] Moreover, the District Court found that the debarment in *Hellenic* was unjustified because it was based on the mere existence of an investigation, rather than on any findings made as a result of that investigation. Here, the results of the audit reports were communicated to Housing Works and provided a clear basis to temporarily suspend procurement actions. While City officials unquestionably made efforts to locate other Housing Work's contracts with the City, this is understandable given the financial irregularities uncovered by the audits. Such actions do not constitute a de facto debarment, and are consistent with the City's position that it was merely examining each contract on a case-by-case basis.

Additionally, even if the City's actions constituted a debarment or suspension, there is no due process violation where "a state employee intentionally deprives an individual of property or liberty, so long as the State provides a meaningful post-deprivation remedy (*Hudson v Palmer*, 468 US [517,] at 531, 533)." (*Hellenic Am. Neighborhood Action Comm. v City of New York*, 101 F3d 877, 880, *supra, cert dismissed* 521 US 1140 [injunction vacated where plaintiff failed to raise debarment claim in abandoned CPLR article 78 proceeding, which would have provided adequate post-deprivation remedy].) In the instant case, plaintiffs did not seek, nor were they deprived of, a post-deprivation remedy. Rather than pursuing any administrative remedies afforded by the City Charter and the PPB Rules, or by commencing an article 78 proceeding, plaintiffs commenced the instant action less than one month after the City's adverse actions. While plaintiffs are entitled to choose their own litigation course, where their due process claim rests on the deprivation of notice and an opportunity to be heard, plaintiffs' own failure to pursue the available remedies may be fatal to such a claim (*Hellenic Am. Neighborhood Action Comm. v City of New York*, 101 F3d, *supra,* at 881-882).

Moreover, Housing Works was given an opportunity to contest the findings in the audits. In a letter dated March 18, 1998, the agency contracting officer for the Department of

---

7. In our view, HRA's October 22, 1997 press release stating that HRA (not every City agency) would take no future procurement action on Housing Works's contracts pending the outcome of the investigation falls well short of the all-inclusive directive issued by the City's Chief Procurement Officer in *Hellenic (supra).*

Health informed Housing Works that "serious questions" concerning Housing Works's responsibility had been raised, and Housing Works was offered the opportunity to respond. This letter fulfills the preliminary requirements in the City Charter and PPB Rules that notice and opportunity to be heard be given prior to any suspension, debarment or non-responsibility determination (NY City Charter § 335 [b] [1], [2]; PPB Rules [9 RCNY] § 7-08 [c] [1]; [e] [1]; § 5-02 [g] [2]). It is not clear from the record whether Housing Works ever responded to this letter, or rather simply pursued this already commenced litigation. Nonetheless, since it has not been shown that Housing Works was not accorded a post-deprivation remedy, and therefore that a due process violation occurred (*Hellenic Am. Neighborhood Action Comm. v City of New York*, *supra*), injunctive relief should have been denied.

Although the eviction of PWA's would qualify as irreparable harm, the submissions in the IAS Court demonstrate that the City is prepared to rely on different Scattered Site vendors to house the PWA's. Thus far, the City's actions have given us no reason to discredit its representations that the PWA's will not be neglected during any transition period, should that ensue.

Nor do we believe that the equities lie in plaintiffs' favor. While Housing Works undeniably serves an important public service, the City cannot be forced to extend expired contracts against its will (*Hellenic Am. Neighborhood Action Comm. v City of New York*, 933 F Supp, *supra,* at 295 [contractor cannot claim entitlement to renewal of expiring contracts, as that is, absent a State statute barring nonrenewal without cause, a matter of contract and not constitutional law]), especially where an investigation has revealed the possibility that a contractor is misusing public funds.

As the motion court improperly made numerous credibility determinations without holding a factual hearing (*see, Genton v Arpeggio Rest.*, 232 AD2d 274, 274-275), we believe the better course is to remand the action to a different Justice. Concur—Tom, J. P., Mazzarelli, Andrias and Saxe, JJ.