OPINION OF THE COURT
Judith A. Hillery, J.
Plaintiffs State of New York and John P. Cahill, as Commissioner of the New York State Department of Environmental Conservation (DEC), contend that Sour Mountain Realty, Inc. (hereinafter Sour Mountain) is violating ECL 11-0535 et seq. by disturbing, harrying, and/or worrying timber rattlesnakes, Crotalus horridus, a species listed by the New York State Department of Environmental Conservation as “threatened.” Plaintiffs commence this enforcement action against Sour Mountain to obtain a permanent injunction barring Sour Mountain from constructing a “snake-proof’ fence along the boundary of its property located off of Route 9 in Fishkill, New York. Simultaneously with the commencement of this action, plaintiffs served Sour Mountain with an order to show cause dated March 5, 1999 which seeks a preliminary injunction enjoining Sour Mountain from unlawfully preventing, deterring or otherwise interfering with the normal dispersal, migration or movement of timber rattlesnakes, and/or from modifying and degrading the timber rattlesnake habitat in the vicinity of Sour Mountain’s property in Fishkill, New York, by erecting and maintaining a “snake-proof’ fence along and/or near the boundary of Sour Mountain’s property. Plaintiffs also seek the immediate removal of all “snake-proof’ fencing already erected by Sour Mountain.
Pending a hearing and determination on plaintiffs’ application, this court issued a temporary restraining order enjoining Sour Mountain from erecting snake-proof fencing along or near its border and from undertaking any construction activities to prepare the area for the erection of such fencing. The temporary restraining order also authorized the employees of the New *316 York State Department of Environmental Conservation to enter onto and inspect Sour Mountain’s property for the purpose of documenting the extent of the snake-proof fencing already constructed and any environmental harm caused by that construction. The hearing on the motion occurred on March 19 and March 22, 1999.
A summary of the facts is necessary for a full appreciation of the issues before this court. On April 3, 1990, Sour Mountain applied to the DEC for five different permits to operate a hard rock surface mine on the property. The applications sought authorization to quarry approximately 52 million tons of assorted rock products from a 120-acre area over a period of 150 years. On July 22, 1991, the DEC determined that pursuant to article 8 of the Environmental Conservation Law (commonly referred to as the State Environmental Quality Review Act or SEQRA), the mining project might have a significant impact on the environment and issued a “positive declaration” stating that a draft Environmental Impact Statement (hereinafter DEIS) must be prepared before the application could be deemed complete. On May 30, 1995, the DEC accepted the DEIS and issued a notice of complete application with respect to the five applications.
The impacts on wildlife examined in the DEIS were based on the result of a 1992 general wildlife survey and a 1993 study which examined potential timber rattlesnake den sites on Sour Mountain’s property. No den sites on or in close proximity to Sour Mountain’s property were discovered during either study. Consequently, Sour Mountain concluded in the DEIS that mining or blasting activities in connection with this proposed project were not expected to have a significant effect on any known timber rattlesnake den. However, in September 1996, after an adjudicatory hearing on the DEIS had been commenced, the DEC received information regarding the existence of a previously unknown timber rattlesnake den located in Hudson Highlands State Park, which is adjacent to Sour Mountain. Two DEC employees and a Sour Mountain consultant subsequently confirmed the location of the timber rattlesnake den in an area known as Bald Hill, approximately 260 feet from Sour Mountain’s property line.
The DEC considered the discovery of the timber rattlesnake den particularly important because that species has been designated as “threatened” under the New York State Endangered Species Act (ECL 11-0535 et seq.). This classification occurred due to a significant decline in timber rattlesnakes in *317 New York as a result of the loss of habitat, road kills, collection and extermination. On January 30, 1997, the DEC issued a positive declaration based on the presence of the rattlesnake den in close proximity to Sour Mountain’s property, and called for the preparation of a supplemental EIS (SEIS) to provide information on the potential impacts of Sour Mountain’s proposed project on the newly discovered Bald Hill rattlesnake den.
Thereafter, Sour Mountain commenced a CPLR article 78 proceeding in Supreme Court, Ulster County (Sour Mtn. Realty v New York State Dept. of Envtl. Conservation, index No. 97-1522), challenging the DEC’s determination to require preparation of an SEIS. The DEC moved to dismiss the petition for the failure to state a cause of action and in a decision and order dated February 18, 1998, that motion was granted. Sour Mountain’s subsequent motion for reargument was denied in a decision and order dated June 17, 1998 and its appeal from both orders is currently pending before the Appellate Division, Third Department.
By letter dated January 20, 1999, Sour Mountain advised the DEC that it intended to install a fence along its property line, including that section of the property separating the proposed mining site from the adjacent Hudson Highlands State Park in order to (1) mark the boundary, (2) make posting the boundary easier, (3) prevent unauthorized entry onto the property by members of the public, and (4) prevent any timber rattlesnakes from the newly discovered den from entering the property. By letter dated January 28, 1999, the DEC notified Sour Mountain that installation of the fence would violate the Endangered Species Act and SEQRA. Thereafter, numerous communications occurred between the DEC and Sour Mountain regarding the fence. Nevertheless, in late February 1999, the DEC learned that Sour Mountain had installed a fence in the area near where the recently discovered rattlesnake den is situated. The fence begins approximately 100 feet to the west of Clove Creek, on the southern portion of Sour Mountain property, and extends for approximately 2,000 feet up slope to the west toward the den. From the corner closest to the den, the fence runs approximately another 1,500 feet to the north and in most places appears to be installed between 30 and 40 feet within Sour Mountain’s property line. The fence is constructed of galvanized wire, with a half-inch square mesh. It is four feet high and is also buried into the ground to a depth of approximately two to four inches, making it impossible for snakes to crawl underneath it.
*318 As a result of this discovery, plaintiffs commenced this action and now seek the issuance of a preliminary injunction barring Sour Mountain from interfering with the normal dispersal, migration or movement of timber rattlesnakes, or from modifying or degrading the timber rattlesnake habitat by the erection and maintenance of its snake-proof fencing. In addition, plaintiffs seek a preliminary injunction requiring Sour Mountain to remove the snake-proof fencing it has already erected at or near its boundary line. Sour Mountain opposes plaintiffs’ application in all respects.
A preliminary injunction may only issue if the moving party can demonstrate (1) the likelihood of success on the merits, (2) irreparable injury if the preliminary injunction is not granted, and (3) that the balancing of equities is in its favor (Doe v Axelrod, 73 NY2d 748, 750; Preston Corp. v Fabrication Enters., 68 NY2d 397, 406; Grant Co. v Srogi, 52 NY2d 496, 517). “ ‘Preliminary injunctive relief is a drastic remedy that will not be granted unless a clear right to it is established under the law * * * and the burden of showing an undisputed right rests upon the movant’” (Zanghi v State of New York, 204 AD2d 313, 314 [2d Dept]).
The merits of this action turn upon the DEC’s statutory authority to enforce the Environmental Conservation Law (ECL 3-0301 et seq.) and Sour Mountain’s alleged violation of ECL 11-0535 (2), which provides: “Notwithstanding any other provision of this chapter, the taking, importation, transportation, possession or sale of any endangered or threatened species of fish, shellfish, Crustacea or wildlife, or hides or other parts thereof, or the sale or possession with intent to sell any article made in whole or in part from the skin, hide or other parts of any endangered or threatened species of fish, shellfish, crustácea or wildlife is prohibited, except under license or permit from the department.” A “taking” includes “pursuing, shooting, hunting, killing, capturing, trapping, snaring and netting fish, wildlife, game, shellfish, crustácea and protected insects, and all lesser acts such a[s] disturbing, harrying or worrying, or placing, setting, drawing or using any net or other device commonly used to take any such animal. Whenever any provision of the Fish and Wildlife Law permits ‘taking’, the taking permitted is a taking by lawful means and in a lawful manner.” (ECL 11-0103 [13] [emphasis added].) The parties have vastly different views of what constitutes a “taking” of timber rattlesnakes and whether defendant’s construction of the snake-proof fence meets that definition.
*319 The DEC essentially argues that timber rattlesnakes follow an annual cycle of activities that include hibernation of the den site over the winter months, emergence from the den site in the spring, migration from the den site to summer home ranges during the summer months, and migration back to the den site in the fall, and that Sour Mountain’s snake-proof fence will disturb, harry, and worry the timber rattlesnake population in its vicinity because it will disrupt the migratory behavior of the timber rattlesnake from the Bald Hill den and deny them access to foraging habitat and home range areas on Sour Mountain property. The DEC also argues that the construction of the snake-proof fence by Sour Mountain violates SEQRA and regulations promulgated pursuant thereto because it amounts to a physical alteration related to an action prior to Sour Mountain complying with the provisions of SEQRA (see, 6 NYCRR 617.3 [a]).
In opposition, Sour Mountain argues that no “taking” has occurred because there has never been a sighting of a single rattlesnake or evidence of the presence of rattlesnakes on Sour Mountain property and the DEC’s speculation as to the possibility that some rattlesnakes from the Bald Hill den may come in contact with the fence is insufficient to show a taking has occurred. Sour Mountain also argues that its construction of the fence does not constitute a violation of SEQRA and 6 NYCRR 617.3 (a) because it is not a “physical alteration” within the meaning of the prohibition set forth in the regulation. Finally, Sour Mountain asserts several defenses. Specifically, it contends that the DEC’s application to have the snake-proof fence removed violates its property rights under the Fifth Amendment Due Process Clause and that the DEC may only prohibit the construction of such a fence after invocation of the Eminent Domain Procedure Law. Sour Mountain also argues that the definition of “taking” in ECL 11-0103 (13) is unconstitutionally vague and therefore void and that the DEC has violated its equal protection rights because it selectively enforces prohibitions against barriers to the movement of rattlesnakes.
This court’s research has revealed no State cases directly addressing the definition of “taking” as used in the context of this action. This explains the parties’ reliance on past decisions by the Commissioner of the New York State Department of Environmental Conservation and related appeals, which address a “taking” in the context of siting solid waste management facilities. However, solid waste regulations specifically *320 prohibit not just a “taking” of an endangered species, but also prohibit “the destruction or adverse modification of their critical habitat” (6 NYCRR 360-1.7 [a] [2] [iii]). Thus, the Commissioner’s determination — that the speculative loss of individual members of an endangered species, which occurs in the context of mitigating conditions designed to avoid destruction or adverse modification of critical habitat, could not constitute a “taking” of individuals of the species (Matter of City of Albany, DEC No. 4-0101-171/1-0 [Feb. 13, 1990]; Matter of Scott Paper Co., DEC Project No. 5-4146-00020/00001-1 [Dec. 22, 1994])— was made as a result of the two competing interests at stake in siting a solid waste facility.
Solid waste regulations are not applicable in this action and this court declines a wholesale adoption of the Commissioner’s balancing of the protection offered by such regulations to both individuals of a species and their critical habitat. Moreover, in a later decision, the Commissioner noted that the determination in Matter of Scott Paper Co. (supra) was “somewhat narrow” in light of the more recent United States Supreme Court decision in Babbitt v Sweet Home Ch. of Communities (515 US 687, 691), which determined that the Interior Department’s interpretation of the term “harm,” as it appears in the definition of “taking,” is broad enough to include “ ‘significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering.’ ”
The Federal Endangered Species Act (16 USC § 1531 et seq.) is also of limited assistance in determining what “taking” means in the context of ECL 11-0535 (2). In the Federal Act, the term “take” means “to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct” (16 USC § 1532 [19]). As already noted, Babbitt v Sweet Home Ch. of Communities (supra) upheld the regulatory definition of “harm” to include significant habitat modification or degradation, thereby reaffirming the broad protection guaranteed to threatened and endangered species. However, the New York State definition of “taking” is not limited to the type of acts enumerated in the Federal statute. Rather, such acts plus “all lesser acts such a[s] disturbing, harrying or worrying” are considered a taking in New York (ECL 11-0103 [13]). Thus, the Federal statute is illuminative because it recognizes the very broad protection offered to threatened and endangered species notwithstanding that its definition of *321 “taking” is narrower than that provided by the New York State statute.
Absent case law and other indicia of the meaning of “taking” in ECL 11-0103 (13), this court determines that it is appropriate to rely on traditional principles of statutory construction in construing that term while recognizing that the DEC’s interpretation of statutes and regulations in the area of its expertise must be afforded deference (see, Matter of Seymour v New York State Dept. of Envtl. Conservation, 184 AD2d 101, 104-105 [3d Dept]; see generally, Flacke v Onondaga Landfill Sys., 69 NY2d 355, 363). Given the clear statement that “pursuing, shooting, hunting, killing, capturing, trapping, snaring and netting” protected species are prohibited, the subsequent term “all lesser acts” must mean acts of less significance or impact than those enumerated. (ECL 11-0103 [13].) If this were not the case, the inclusion of “lesser acts” would be merely redundant. Moreover, the terms “disturbing, harrying or worrying” are merely examples of lesser included acts and do not encompass all lesser acts which are prohibited.
Finally, resort to the plain meaning of the operative words is appropriate. Specifically, “disturb” is defined as “1(a): to interfere with: interrupt (b): to alter the position or arrangement of (c): to upset the natural and esp. the ecological balance or relations of 2(a): to destroy the tranquility or composure of (b): to throw into disorder (c): alarm (d): to put to inconvenience” (Webster’s Collegiate Dictionary 338 [10th 1998]); “harry” is defined as “1: to make a pillaging or destructive raid on: assault 2: to force to move along by harassing 3: to torment by or as if by constant attack” (id., at 531); and “worry” is defined as “2(c): to touch or disturb something repeatedly (d): to change the position of or adjust by repeated pushing or hauling 3(a): to assail with rough or aggressive attack or treatment: torment (b): to subject to persistent or nagging attention or effort 4: to afflict with mental distress or agitation: make anxious” (id., at 1365). Given these definitions and the plain language of the statute, which indicates that “all lesser acts” in a similar vein constitute a “taking,” this court concludes that a modification of rattlesnake habitat constitutes a taking under ECL 11-0103 (13). Thus, whether the Sour Mountain fence actually modifies the Bald Hill den rattlesnakes’ habitat is determinative in this action. A consideration of this issue must necessarily address the parties’ respective experts’ opinions.
The hearing before this court on March 19 and 22, 1999 presented a classic case of a “battle of the experts.” Plaintiffs *322 relied on two expert witnesses, Dr. Theodore Kerpez and Dr. William Brown. Dr. Kerpez is an expert in wildlife science, with emphasis on the relationships between wildlife and their habitat and the impact of human activities on wildlife and their habitat. He is Senior Wildlife Biologist in the DEC’s Region III Office, where he is in charge of the Endangered and Threatened Species Program and Biological Diversity Program for the region. Dr. Kerpez has reviewed 30 to 40 projects over the past nine years to assess the potential impact of those projects on the Eastern timber rattlesnake and is currently supervising a long-term research project by the DEC which is examining the female reproductive ecology of timber rattlesnake populations in the Shawangunk Mountains. He was qualified by this court as an expert in assessing the impact of human activities on the Eastern timber rattlesnake.
Dr. William Brown is an expert in the field of biology. He was employed for 23 years as a biology professor at Skidmore College where he taught Comparative Vertebrate Anatomy, Field Zoology of Vertebrates, Conservation Biology, Environmental Science and other courses. Part of these courses specifically addresses snake ecology and behavior, including snake identification, life history and basic biology. Two of Dr. Brown’s courses, Field Zoology of Vertebrates and Conservation of Endangered Species, involve studies of the Eastern timber rattlesnake, including identification and life history features. Since retiring from Skidmore College, Dr. Brown has taught Field Biology at the State University of New York at Albany, which includes the study of the timber rattlesnake in the lab portion of the course. He has also worked as an independent consultant on conservation of timber rattlesnake populations. One of his clients was Scenic Hudson, Inc. which retained Dr. Brown to evaluate the Bald Hill den site and conduct field work on the Bald Hill timber rattlesnake population.
In addition to teaching and consulting, Dr. Brown has been involved in long-term research on timber rattlesnake populations in New York State. This research has involved denning characteristics, ecology and behavior of timber rattlesnakes and has included studies of timber rattlesnake movement, temperature relationships, hibernation characteristics, scent trailing by newborns, female reproductive ecology and male reproductive ecology. Dr. Brown’s field research has resulted in the publication of 10 articles pertaining to the various aspects of timber rattlesnake ecology and behavior in peer-reviewed scientific journals. He is also the author of the only scientific *323 monograph on the Eastern timber rattlesnake, Biology, Status, and Management of the Timber Rattlesnake (Crotalus horridus): A Guide for Conservation, published by the Society for the Study of Amphibians and Reptiles. This court qualified Dr. Brown as an expert in the ecology and behavior of the Eastern timber rattlesnake.
Plaintiffs’ experts’ testimony shows that the timber rattlesnake hibernates in communal dens for approximately seven months of the year. The den is central and critical to the viability and survival of the entire population. Timber rattlesnakes are migratory, moving away from the den site in the spring (called “out-migration”) and moving back toward the den in autumn (called “in-migration”). During out-migration, rattlesnakes migrate away from the den site in virtually all directions into forested summer range habitats located typically up to one to two miles from the den. During in-migration, rattlesnakes return to their den site, using several possible mechanisms of orientation to do so. Individual snakes exhibit extremely high fidelity to a particular den.
Dr. Kerpez opined that approximately 20% of the total area within a half mile of the Bald Hill den site lies on property owned or controlled by Sour Mountain. Both Dr. Kerpez and Dr. Brown testified that it is extremely likely that some of the rattlesnakes from the Bald Hill den will intercept the Sour Mountain snake-proof fence and that that fence will interfere with their normal migration, foraging, shedding, mating, basking, and gestational activities.
Sour Mountain relied on two witnesses: Dr. Roy Budnik, a fact witness, and Mr. Robert Zappalorti, an expert witness. For the last 10 years, Dr. Budnik has been the project manager involved in the design and preparation of the Impact Statement for Sour Mountain’s proposed quarry and all studies related to that quarry. Dr. Budnik testified that Sour Mountain’s property is relatively similar to the adjacent property upon which the Bald Hill den is located. However, Dr. Budnik challenged Dr. Kerpez’s conclusion that 20% of the total area within a half mile of the Bald Hill den lies on property owned or controlled by Sour Mountain. In his opinion, the percentage is somewhere between 15 and 17%. Finally, Dr. Budnik testified that to his knowledge Sour Mountain never granted permission to the DEC to enter its land for the purposes of conducting timber rattlesnake surveys.
Mr. Robert Zappalorti testified that he possesses no educational degree higher than a high school diploma and amassed *324 his expertise regarding the timber rattlesnake first as a hobbyist, later as an employee at the Staten Island Zoo, and throughout as a result of his relationships with professional herpetologists and university professors. Mr. Zappalorti frequently lectures on the timber rattlesnake and has published several peer-review articles, including two that were relied upon by plaintiffs’ experts. This court qualified Mr. Zappalorti as an expert on the ecology and environment of timber rattlesnakes.
Mr. Zappalorti testified that the timber rattlesnake is “in definite trouble” as a result of overcollecting and habitat loss. He also testified about his ecological study of the timber rattlesnake on the Rushmore property in Orange County, New York. That study included a mark and recapture component, a radio tracking component, and a test of a portion of a wildlife exclusion barrier, or snake-proof fence, to determine the effectiveness of a large barrier on rattlesnake movement. The over-all goal of the study was to gather information on timber rattlesnake habitat use to develop a mitigation plan for the protection of the species. Mr. Zappalorti was required to obtain DEC approval prior to conducting the study.
Mr. Zappalorti conducted a study of Sour Mountain’s property to look for the presence of rattlesnakes and the presence of rattlesnake habitat. Neither he nor any member of his team located a single rattlesnake or other evidence of the presence of rattlesnakes on Sour Mountain’s property. Based on the Sour Mountain study, it is Mr. Zappalorti’s opinion that there is no actual significant rattlesnake habitat located on Sour Mountain property. However, Mr. Zappalorti acknowledged that Sour Mountain’s property possibly lies within the home range of some members of the Bald Hill rattlesnake population, and that it contains foraging habitats as well as potential shedding stations for timber rattlesnakes. Mr. Zappalorti opined that even if some rattlesnakes came in contact with Sour Mountain’s fence, such contact would not be harmful.
Sour Mountain makes much of the fact that its expert Mr. Zappalorti never observed a rattlesnake or evidence of rattlesnakes on Sour Mountain property. However, the testimony of Mr. Zappalorti indicates that Mr. Zappalorti’s team conducted their survey during 10 days from April through June 6, 1997 and on one day in mid-September 1997. Both plaintiffs’ and Sour Mountain’s experts agreed that these are the times of year when timber rattlesnakes are most likely to be found in the immediate vicinity of their den sites and Dr. *325 Brown testified that the optimal time of year to find rattlesnakes away from the den site is mid-June through August. Moreover, the testimony also showed that defendant has refused to allow plaintiffs’ experts to enter Sour Mountain’s property to determine if it is part of the Bald Hill den rattlesnakes’ habitat. Finally, the very fact that Sour Mountain has constructed a fence in order to prevent rattlesnakes from entering upon its property supports, rather than rebuts, plaintiffs’ experts’ claim that Sour Mountain’s property is part of the habitat of the Bald Hill den rattlesnakes.
Although the parties’ respective experts’ testimony raises issues of credibility, as well as issues of fact as to the effect of the snake-proof fence, such issues of fact and credibility do not preclude granting plaintiffs injunctive relief if plaintiffs have established a likelihood of success on the merits, that they will suffer irreparable injury if the preliminary injunction is not granted and that the balancing of equities is in their favor (see, Housing Works v City of New York, 255 AD2d 209 [1st Dept]; CPLR 6312 [c]). In addressing whether plaintiffs are likely to succeed on the merits in this enforcement action, it is only necessary to look at the probability of such success. Based on the expert testimony, this court concludes that plaintiffs have met their burden. Should the fence interfere with the normal migratory patterns of the Bald Hill rattlesnakes, or deprive them of habitat for foraging, shedding, mating, basking, or gestational activities, a “taking” of such rattlesnakes would occur. This court is not required to allow such a taking prior to enjoining acts in violation of ECL 11-0535 (2).
Moreover, plaintiffs have met their burden of showing they will suffer irreparable harm if the defendant is permitted to maintain its snake-proof fence. Plaintiffs are charged with the protection of all threatened species, including the timber rattlesnake. Harm to such species impacts upon the quality of life of all New York State residents and is not compensable by monetary damages.
Finally, a balance of the equities clearly favors plaintiffs. While defendants contend that any harm to timber rattlesnakes flowing from its snake-proof fence is purely speculative, it is Sour Mountain’s refusal to allow plaintiffs’ experts access to their property which has denied plaintiffs the opportunity to actually determine the risk posed by the snake-proof fence to the Bald Hill den rattlesnakes. Sour Mountain cannot refuse access to its property and then use the lack of concrete information resulting from that refusal to defeat plaintiffs’ experts’ *326 testimony. Accordingly, plaintiffs’ motion for a preliminary injunction requiring Sour Mountain to remove its snake-proof fence, and barring it from interfering with the normal dispersal, migration or movement of timber rattlesnakes, or from modifying timber rattlesnake habitat on its property, is granted. Sour Mountain will immediately remove the snake-proof fence and will allow plaintiffs’ experts access to its property from April through September 1999 upon reasonable notice (see, New York State Envtl. Facilities Corp. v Young, 66 Misc 2d 299 [Sup Ct, Monroe County]).
Plaintiffs also contend that the preliminary injunction is warranted because Sour Mountain has violated SEQRA and 6 NYCRR 617.3 (a). However, this court concludes that it is not likely that plaintiffs will prevail on the merits of this claim. The regulation at issue provides that “[a] project sponsor may not commence any physical alteration related to an action until the provisions of SEQR have been complied with” (6 NYCRR 617.3 [a] [emphasis added]) and “physical alteration” is defined, inter alia, as “construction of buildings, structures or facilities” (6 NYCRR 617.2 [a], [b]). It is undisputed that Sour Mountain’s proposed mining project sought to construct snake-proof fencing around the mining site and not around the property’s boundary. Thus, the construction of the fence on the border of Sour Mountain’s property is not “related to” the mining proposal and to the extent plaintiffs’ motion seeks a preliminary injunction on this ground, it is denied.
This court finds it unnecessary at this point to address Sour Mountain’s various affirmative defenses. Upon the completion of the field study already ordered by this court, and the exchange of other discovery materials by the parties, a determination will be made on the merits of plaintiffs’ enforcement claim and defendant’s affirmative defenses will be adequately addressed at that time.
Plaintiffs’ motion for a prehminary injunction enjoining defendant (1) from continuing to violate the New York State Endangered Species Act (ECL 11-0535 et seq.) by disturbing, harrying or worrying timber rattlesnakes, (2) from unlawfully preventing, deterring or otherwise interfering with the normal dispersal, migration or movement of timber rattlesnakes, and from modifying and/or degrading the timber rattlesnake habitat in the vicinity of defendant’s property through the erection and maintenance of snake-proof fencing along and/or near the boundary of that property, and (3) to remove all the snake-proof fencing it has erected along and/or near the bound *327 ary of its property, is granted. The fence will be removed by defendant on or before April 3, 1999. There has been no showing by Sour Mountain as to the potential damages it may sustain as a result of the issuance of the preliminary injunction. Accordingly, this court declines to set an amount of damages for which plaintiffs may be liable (CPLR 2512).