[714 NYS2d 78]

Sᴛᴀᴛᴇ ᴏғ Nᴇᴡ Yᴏʀᴋ et al., Respondents, v Sᴏᴜʀ Mᴏᴜɴᴛᴀɪɴ Rᴇᴀʟᴛʏ, Iɴᴄ., Appellant.

Second Department, October 2, 2000

*Wichler & Gobetz,* Suffern (*Laura Zeisel, Kenneth C. Gobetz,* and *Kenneth M. Stenger* of counsel), for appellant.

*Eliot Spitzer, Attorney General,* New York City (*Christopher A. Amato* and *Robert Rosenthal* of counsel), for respondents.

*John W. Caffry,* Glens Falls (*Inga L. Fricke* of counsel), for Scenic Hudson, Inc., Scenic Hudson Land Trust, Inc., and another, *amicus curiae.*

*Hinman, Straub, Pigors & Manning, P. C.,* Albany (*Bartley J. Costello, III* and *Deirdre Roney* of counsel), for New York State Builders Association, Inc., and others, *amicus curiae.*

*John G. Schmidt, Jr.,* Buffalo (*M. Reed Hopper* and *David E. Haddock* of counsel), for Pacific Legal Foundation, *amicus curiae.*

*Environmental Policy Project,* Washington, D.C. (*John D. Echeverria* and *Jon T. Zeidler* of counsel), *amicus curiae.*

**OPINION OF THE COURT**

Per Curiam.

On appeal we must construe a portion of ECL 11-0535 (hereinafter the New York State Endangered Species Act) to determine whether a "taking" of a threatened species includes the modification of its habitat. We hold that a prohibited taking of a protected species may occur upon the modification of its habitat. Moreover, under the particular circumstances before us, we conclude that the Supreme Court properly found that the defendant had committed a taking of a threatened species under the New York State Endangered Species Act and therefore affirm the order granting the preliminary injunction.

I

This appeal involves a timber rattlesnake den that was discovered approximately 260 feet from the property line of a parcel of real property owned by the defendant, Sour Mountain Realty, Inc. (hereinafter Sour Mountain) (*see, State of New York v Sour Mtn. Realty,* 183 Misc 2d 313). The timber rattlesnake (crotalus horridus) has been designated a threatened species in

the State of New York (*see*, ECL 11-0535; 6 NYCRR 182.6 [b] [5]). The defendant's parcel is rugged, rocky, and undeveloped, and lies adjacent to land that is being used as part of Hudson Highlands State Park (*see*, *Matter of Scenic Hudson v Town of Fishkill Town Bd.*, 258 AD2d 654). The defendant seeks to conduct mining operations on its 213-acre site and is in the process of applying for a mining permit from the New York State Department of Environmental Conservation (hereinafter the DEC) as required by the Mined Land Reclamation Law (*see generally*, ECL art 23, tit 27; *see also*, *Matter of Sour Mtn. Realty v New York State Dept. of Envtl. Conservation*, 260 AD2d 920).

Upon learning of the existence of the rattlesnake den, the defendant informed the DEC that it intended to construct a four-foot-high snake-proof fence, running approximately 3,500 feet along its property line. The obvious and acknowledged purpose of the fence was to keep timber rattlesnakes off of the defendant's property. The DEC responded to the defendant's plans by advising it that "should the placement and nature of the fencing or other activity unilaterally undertaken by [you] harass or harm or significantly modify, degrade, or limit the habitat of the identified [snakes], the Department would consider such activity to be violative of ECL § 11-0535 and 6 NYCRR part 182." The defendant nevertheless erected the fence.

After being informed of the erection of the fence, the State of New York and the Commissioner of the DEC commenced the instant action to permanently enjoin the defendant from continuing to use the fence.

## II

The plaintiffs moved to preliminarily enjoin the defendant from continuing to use the fence and a hearing was held. At the hearing, Theodore Kerpez, a DEC biologist, described, in detail, the behavior of the timber rattlesnake and the significance of the snake's den to its survival. Kerpez observed that snake dens have very specific characteristics and generally face south so as to benefit from optimum sunlight. The dens, used by the snakes to hibernate during the winter months, are actually crevices or fissures in the earth. These formations extend deep enough to provide a stable, above-freezing temperature during periods of hibernation. There are only a limited number of such dens in New York State, and it appears that each such den has been used for generations by the same population of snake.

Kerpez testified that once the spring arrives, the snakes disperse in all directions from the den, foraging for food. Studies have established that, during this time, the snakes will travel between two and one-half and three miles. Nevertheless, the snakes have "extremely high fidelity" to their den, habitually returning to it each winter.

Kerpez observed that the snakes were not really dangerous to people and that an individual has more of a chance of "being struck by lightning than being bitten by a rattlesnake."

Using various surveying techniques, including the satellite-based global positioning system, Kerpez located the den in question as being approximately 260 feet from Sour Mountain's property line.

Kerpez testified that the snake-proof fence erected by the defendant will have a negative impact upon the well-being of the snakes inhabiting the den because it will interfere, disrupt, and prevent the normal migratory patterns of the snakes. In addition, it will deprive the rattlesnakes inhabiting the den of a significant portion of their habitat, with attendant negative consequences.

A second biologist, William Brown, also testified for the plaintiffs. According to Brown, the timber rattlesnakes are "an ecologically important species" because "they form * * * part of the food web in the deciduous forest in which they are an important predatory animal" and "contribute to the energy transfer in the food web."

Brown believed that the installation of the fence along the boundary to Sour Mountain's property would have three basic negative impacts upon the snakes inhabiting the den in question. First, the fence would interfere with the snake's normal migratory movements. Second, the fence would deprive the snakes of summer habitats that are currently used for foraging. Third, the fence would divert or shunt the snakes in either direction along the length of the fence until they come to its terminus "at a great distance away from the den." This would potentially put the snakes "in harm's way" and increase "the potential for mortality on the snakes."

In response to the plaintiffs' evidence, the defendant primarily relied on the testimony of Robert Zappalorti, an expert on snakes who testified generally that there was no evidence of either a snake den on the defendant's property or any "snake use." However, Zappalorti testified that there were two potential "shedding stations" on the defendant's property and

acknowledged that removing a snake from its "home range" would both disorient and disturb the snake.

### III

The Supreme Court granted the motion for a preliminary injunction and directed the defendant to remove the fence. Initially, the court noted that the New York State Endangered Species Act empowered the DEC to demand the removal of the fence. In this regard, the court recognized that "the DEC's interpretation of statutes and regulations in the area of its expertise must be afforded deference" (*State of New York v Sour Mtn. Realty,* 183 Misc 2d 313, 321, *supra*).

The court then held that the plaintiffs had established the likelihood of success on the merits. Relying upon the expert testimony put forward by the plaintiffs, the court concluded that the fence would interfere with the migratory patterns of the timber rattlesnakes and that this would constitute a taking under the New York State Endangered Species Act. The court noted that it was "not required to allow such a taking prior to enjoining acts in violation of ECL 11-0535 (2)" (*State of New York v Sour Mtn. Realty, supra*, at 325).

In addition, the court concluded that the plaintiffs would suffer irreparable harm if the fence were not removed: "Plaintiffs are charged with the protection of all threatened species, including the timber rattlesnake. Harm to such species impacts upon the quality of life of all New York State residents and is not compensable by monetary damages" (*State of New York v Sour Mtn. Realty, supra*).

Finally, the court found that a balance of the equities favored the plaintiffs. Accordingly, the court ordered the immediate removal of the fence (*see, State of New York v Sour Mtn. Realty, supra*).

### IV

The defendant does not contest the fact that the fence will interfere with the habitat and migratory patterns of the timber rattlesnake. Rather, the defendant asserts that the DEC does not have the statutory authority under the New York State Endangered Species Act to protect the habitat of a threatened or endangered species. According to the defendant, the DEC only has the authority to prevent the intentional harming or killing of such species. In the defendant's view, the DEC cannot prevent so tenuous a harm as habitat destruction. We disagree.

Under the New York State Endangered Species Act, "the taking * * * of any endangered or threatened species * * * is prohibited" (ECL 11-0535 [2]). "Taking" is defined as follows: " 'Taking' and 'take' include pursuing, shooting, hunting, killing, capturing, trapping, snaring and netting fish, wildlife, game, shellfish, crustacea and protected insects, and all lesser acts such as disturbing, harrying or worrying, or placing, setting, drawing or using any net or other device commonly used to take any such animal. Whenever any provision of the Fish and Wildlife Law permits 'taking', the taking permitted is a taking by lawful means and in a lawful manner" (ECL 11-0103 [13]).

In light of the broad language of this statute, including the prohibition against "all lesser acts such as disturbing, harrying or worrying" an endangered or threatened species, we conclude that the DEC has the statutory authority to protect the habitats of such species (see, ECL 11-0103 [13]). We agree with the Supreme Court that the proscribed "lesser acts" logically include habitat modification. As that court stated: "Given the clear statement that 'pursuing, shooting, hunting, killing, capturing, trapping, snaring and netting' protected species is prohibited, the subsequent term 'all lesser acts' must mean acts of less significance or impact than those enumerated. * * * If this were not the case, the inclusion of 'lesser acts' would merely be redundant" (State of New York v Sour Mtn. Realty, supra, at 321).

As we have often observed, "[i]t is a basic principle of statutory interpretation that 'statutory language is generally to be construed in accordance with its plain and obvious sense, and the meaning attached to it should be neither strained nor artificial' " (ILC Data Device Corp. v County of Suffolk, 182 AD2d 293, 298-299, quoting Shoreham-Wading Riv. Cent. School Dist. v Town of Brookhaven, 107 AD2d 219, 223 [other citations omitted]; see also, McKinney's Cons Laws of NY, Book 1, Statutes § 94). It is apparent from the statutory language at issue that the Legislature intended broad protection to be afforded protected species and that habitat protection may, under appropriate circumstances, be encompassed within that protection (see, McKinney's Cons Laws of NY, Book 1, Statutes §§ 92, 96).

We observe that the legislative history of the New York State Endangered Species Act indicates that it was intended to compliment the Federal Endangered Species Act (see, L 1970, ch 1047; see also, Mem of State Exec Dept, 1970 McKinney's

Session Laws of NY, at 3030; Governor's Mem, 1970 McKinney's Session Laws of NY, at 3150). The defendant has acknowledged this both in its brief and at oral argument. The Federal Endangered Species Act makes it illegal to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" any endangered species or to attempt to do so (16 USC § 1532 [19]; § 1538 [a]). As the Federal Court of Appeals, 10th Circuit, has observed: "The prohibition against 'harming' an endangered species is especially broad, having been construed to mean that one who maintains on his own land grazing animals that so modify natural habitat as to cause indirect injury to endangered species can be required to remove those grazing animals from his land. * * * Thus, even though eagles and other endangered species often prey on privately-owned livestock and poultry, the Endangered Species Act prohibits self-help measures which have the effect of 'harming' such predators" (*Mountain States Legal Found. v Hodel,* 799 F2d 1423, 1427-1428 [citations omitted], *cert denied* 480 US 951).

Significantly, in interpreting the Federal Endangered Species Act, the United States Supreme Court has concluded that the Secretary of the Interior had the statutory authority to promulgate a rule that defined the "taking" of an animal as including " 'significant habitat modification or degradation where it actually kills or injures wildlife' " (*Babbitt v Sweet Home Ch. of Communities for Greater Oregon,* 515 US 687, 690). The Court noted that the statutory definition of "take" included "harm" to the endangered animal and that harm, in the context of the Endangered Species Act, "naturally encompasses habitat modification that results in actual injury or death to members of an endangered or threatened species" (*Babbitt v Sweet Home Ch. of Communities for Greater Oregon, supra,* at 697; *see also, Strahan v Coxe,* 127 F3d 155, 165, *cert denied* 525 US 830, *cert denied sub nom. Coates v Strahan,* 525 US 978 [deployment of commercial fishing gear which significantly impaired right whale habitat constituted a taking]; *Forest Conservation Council v Rosboro Lbr. Co.,* 50 F3d 781 [allegations that proposed clearcutting was reasonably certain to injure the spotted owl by significantly impairing its essential behavioral patterns were actionable under the Federal Endangered Species Act]; *Sierra Club v Yeutter,* 926 F2d 429, 438-439 [Forest Service's management of timber stands that jeopardized the habitat of the red-cockaded woodpecker constituted a taking]; *Palila v Hawaii Dept. of Land & Nat. Resources,* 639 F2d 495, 497-498 [State's practice of maintaining

feral goats and sheep in the habitat of the palila, an endangered bird, constituted a taking; State ordered to remove goats and sheep]; *United States v Town of Plymouth,* 6 F Supp 2d 81 [off-road vehicles barred from driving on beach unless appropriate precautions are taken to protect piping plovers, which are threatened species under the Federal Endangered Species Act]; *Loggerhead Turtle v County Council,* 896 F Supp 1170, 1180-1181 [County's authorization of vehicular beach traffic during turtle mating season constituted a taking in violation of the Federal Endangered Species Act]).

It should be observed that the definition of a "taking" included in the Federal Act is somewhat narrower than the definition under review. Nevertheless, as set forth above, the Federal courts have consistently held that habitat interference may constitute a "taking" of a threatened species. We find the reasoning of these cases persuasive. Upon the foregoing, we conclude that habitat interference may constitute a taking under ECL 11-0535.

## V

Turning again to the facts of the instant case, we initially note the well-settled principle that a party seeking preliminary injunctive relief must demonstrate (1) a likelihood of success on the merits, (2) irreparable injury absent the granting of a preliminary injunction, and (3) that the balancing of the equities favors the movant's position (*see, Randisi v Mira Gardens,* 272 AD2d 387; *see also, Aetna Ins. Co. v Capasso,* 75 NY2d 860; *Grant Co. v Srogi,* 52 NY2d 496, 517).

We agree with the Supreme Court that the plaintiffs have established the likelihood of success on the merits. Contrary to the defendant's contention, the sole purpose of the fence on the perimeter of its property was to interfere with the normal migratory patterns of a threatened species. Moreover, the parcel in question is rural and undeveloped. While the propriety of the DEC's exercise of its regulatory power must be decided on a case-by-case basis, we conclude that under the particular facts of this case, the DEC's determination that the placement of the fence constituted a taking of a threatened species was neither arbitrary nor capricious (*see, Babbitt v Sweet Home Ch. of Communities for Greater Oregon, supra,* at 708; *see also, Matter of Seymour v New York State Dept. of Envtl. Conservation,* 184 AD2d 101, 104-105; *New York State Thruway Auth. v Dufel,* 129 AD2d 44).

We additionally conclude that violation of the statutory provision is sufficient to show irreparable harm (*see,* ECL 11-0103;

*State of New York v Brookhaven Aggregates,* 121 AD2d 440, 442; *see also, Tennessee Val. Auth. v Hill,* 437 US 153, 187; *Adirondack Park Agency v Hunt Bros. Contrs.,* 234 AD2d 737). Moreover, the equities favor the plaintiffs (*see, Town of Thompson v Braunstein,* 247 AD2d 753, 754-755; *see also, Strahan v Coxe, supra,* at 171). Under these circumstances, the plaintiffs were properly granted preliminary injunctive relief.

## VI

Finally, we reject the defendant's assertion that the actions of the DEC can be equated with a taking of the defendant's property without just compensation. In this regard, we note that the removal of the fence cannot be deemed a regulatory taking of the defendant's parcel since any economic impact on the parcel would be tenuous at best (*cf., Lucas v South Carolina Coastal Council,* 505 US 1003; *Nollan v California Coastal Commn.,* 483 US 825). In addition, the State has not physically occupied or appropriated any portion of the parcel (*cf., Loretto v Teleprompter Manhattan CATV Corp.,* 458 US 419, 426; *Andrus v Allard,* 444 US 51, 65; *Penn Cent. Transp. Co. v City of New York,* 438 US 104). Rather, the State, through the exercise of its police power, is safeguarding the welfare of an indigenous species that has been found to be threatened with extinction (*see, Barrett v State of New York,* 220 NY 423, 428; *Matter of Fishway in Town of Deposit,* 131 App Div 403, 411-412). The State's interest in protecting its wild animals is a venerable principle that can properly serve as a legitimate basis for the exercise of its police power (*see,* ECL 11-0535, 11-0105; *Barrett v State of New York, supra; see also, People v Bootman,* 180 NY 1, 8-9).

The defendant's remaining contentions are similarly without merit (*cf., Village of Willowbrook v Olech,* 528 US 1073).

Based on all of the above considerations, we conclude that the Supreme Court properly granted the plaintiffs' motion for a preliminary injunction, and therefore, the order must be affirmed.

RITTER, J. P., SULLIVAN, KRAUSMAN and GOLDSTEIN, JJ., concur.

Ordered that the order is affirmed, with costs.